# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Kiawah Development Partners, II, Respondent,

v.

South Carolina Department of Health and Environmental Control, Appellant,

and

South Carolina Coastal Conservation League, Appellant,

v.

South Carolina Department of Health and Environmental Control and Kiawah Development Partners, II, of whom South Carolina Department of Health and Environmental Control is Appellant, and Kiawah Development Partners, II is Respondent.

Appellate Case No. 2010-155629

---

Appeal from the Administrative Law Court
Ralph K. Anderson, III, Administrative Law Judge

---

Opinion No. 27065
Heard June 5, 2013 – Refiled December 10, 2014

---

**REVERSED AND REMANDED**

---

Jacquelyn Sue Dickman, of Columbia, Bradley D. Churdar, of Charleston, Amy E. Armstrong, of the South Carolina Environmental Law Project, of Pawleys Island, and Robert T. Bockman, of Columbia, for Appellants.

G. Trenholm Walker, of Pratt-Thomas Walker, PA, and Gedney M. Howe, III, of Gedney M. Howe III, PA, both of Charleston, for Respondent.

Attorney General Alan M. Wilson, Chief Deputy Attorney General John W. McIntosh, Solicitor General Robert D. Cook, and Assistant Attorney General T. Parkin Hunter, and C. Mitchell Brown and A. Mattison Bogan, both of Nelson Mullins Riley & Scarborough, LLP, all of Columbia, for Amicus Curiae, Savannah River Maritime Commission.

Frank S. Holleman, of the Southern Environmental Law Center, of Chapel Hill, NC, and J. Wesley Earnhardt, Michael P. Addis, and Margaret B. Hoppin, all of Cravath, Swaine & Moore, LLP, of New York, for Amicus Curiae, The South Carolina Nature-Based Tourism Association.

Jordan R. Israel, of Washington, D.C., for Amicus Curiae, Inlet Cove Homeowners Association, Kayak Charleston, LLC, South Carolina Paddlesports Industry Association, and Friends of the Kiawah River.

James B. Richardson, Jr., of Columbia, for Amicus Curiae, South Carolina Manufacturer's Alliance.

Michael Robert Hitchcock, of Columbia, for Intervenors.

_____

**JUSTICE HEARN:** Our State's tidelands are a precious public resource held in trust for the people of South Carolina. While the tidelands are a finite

resource, a bevy of competing environmental, economic, and social uses seek to lay claim to them. The legislative branch has made the policy decisions as to how those uses should be balanced in order to maximize the benefit to the people of South Carolina and enacted statutes and delegated to executive agencies the power to promulgate regulations to fulfill those policy decisions. The task falls to the courts to ensure that those statutes and regulations are correctly applied in carrying out that policy.

At issue here is the correct application of those statutes and regulations to an invaluable—in environmental, economic, and social terms—stretch of tidelands located on the edge of a spit of land along the South Carolina coast. A landowner and real estate developer seeks a permit to construct a bulkhead and revetment stretching 2,783 feet in length and 40 feet in width over the State's tidelands, thereby permanently altering 111,320 square feet or over 2.5 acres of pristine tidelands. The landowner seeks to halt ongoing erosion along that stretch of tidelands in order to facilitate a residential development on the adjacent highland area. DHEC denied the majority of the requested permit and granted a small portion to protect an existing county park. An administrative law court (ALC) disagreed and found a permit should be granted for the entire structure, and this appeal followed. We conclude the ALC committed several errors of law and therefore, we reverse and remand.

## FACTUAL/PROCEDURAL BACKGROUND

Kiawah Island is a barrier island approximately one mile wide and stretching approximately ten miles along South Carolina's coast. At the island's eastern end it is separated from Folly Beach by Stono Inlet where the Stono River empties into the Atlantic Ocean. The Island is separated from John's Island and the mainland to the north by the Kiawah River. At the island's western end, the Kiawah River turns to the south and travels along the Island's western edge. From the western tip of the Island, Captain Sam's Spit extends along the coast in a southwesterly direction towards Seabrook Island. The Spit consists of a narrow "neck" where it extends away from the Island and then grows into a large, bulbous end. At the point at which the Kiawah River meets the Spit where it extends from the end of the Island, the Kiawah River turns to the west, wraps around the bulb of the Spit, and then turns to the south. There the River passes through Captain Sam's Inlet between the Spit and Seabrook Island and empties into the Atlantic Ocean.



Fig. 1: Captain Sam's Spit

At the present time, where the Spit meets the larger island and Kiawah River turns to travel along the Spit—the neck—the Spit is approximately 450 feet wide measured from the critical line on the River side to the mean high water line on the Atlantic Ocean side. At its widest part the Spit has a high ground width of more than 1,600 feet. The Spit has a number of high dune ridges running its entire length, and, on the river side of the bulbous end, a young and growing maritime forest. When the tide recedes in the River, a soft, sandy beach is exposed on the Spit along the area where the River bends. The portion of the Island at the western end immediately upriver of the Spit's neck is occupied by a Charleston County park which the County leases from Kiawah Development Partners, II, Inc. (Kiawah). The Spit's neck and the adjacent area where the county park is located are eroding. At points along the bend in the river, a vertical escarpment as high as

ten to twelve feet exists.  While a portion of the river side of the Spit is eroding, on the ocean side the Spit has steadily accreted over the past several decades.

While the River side of the Spit is experiencing erosion, the Spit as a whole is growing.  The ocean side of the Spit has steadily accreted sand for the past sixty years and at present the accretion is occurring at a faster rate than the rate of erosion on the River side.  Over the past three hundred years, however, at least twice a version of the Spit has formed, followed by the breach of the Spit's neck, and the disappearance of the Spit.  The present Spit began to reform around 1949.

In 1988, Kiawah purchased the Island including the Spit; the same year the Town of Kiawah Island was incorporated.  Prior to 1999, there was no building setback line on the Spit and therefore the Spit could not be developed.[1]  Accordingly, in 1994, the Town and Kiawah entered into a development agreement which limited the uses of the Spit to green space and parkland and thereby prohibited development of the Spit.  In 1999, due to continued accretion on the ocean side of the Spit and the Spit's resulting growth, the State established a setback line on the Spit thereby permitting development on the Spit landward of the setback line.  In 2005, the Town and Kiawah entered into a new development agreement which permits development of up to fifty home sites and two community docks on the Spit.

In order to facilitate development of the Spit, Kiawah hired an engineering firm to design an erosion control structure to stop the erosion occurring along the bend in the Kiawah River.  The firm recommended the combination of an articulated concrete block mat[2] and a bulkhead and prepared a permit application on Kiawah's behalf.  The application sought approval from the South Carolina Department of Health and Environmental Control (DHEC) to construct a combination bulkhead and articulated concrete block revetment beginning at the

---

[1] Section 48-39-280(B) of the South Carolina Code (2008) requires DHEC to establish a "setback line . . . landward of the baseline a distance which is forty times the average annual erosion rate or not less than twenty feet from the baseline . . . ."  At that time, the width of the Spit was not sufficient for the creation of a setback line.

[2] An articulated concrete block is a rectangular block of concrete with a hole in the middle, and an articulated concrete block mat is a mat of those blocks linked together.

county park and extending for 2,783 feet along the Spit around the bend in the River.[3] The mat would extend a width of forty feet from the bulkhead down into the River and would cover the entire beach.

DHEC staff issued a permit to Kiawah but only for construction of a bulkhead and revetment to extend 270 feet along the shoreline adjacent to the county park. It denied the remainder of the requested 2,783 feet of bulkhead and revetment. The staff found the structure would "affect the ability of the inlet and the beach/dune system to migrate, as it has been known to do in the recent past." They also found the structure and the proposed development that the structure would facilitate would "have long-range and cumulative effects on [sensitive areas] and on the general character of the area." The staff found the proposed structure would contravene Section 48-39-150(A)(6) of the South Carolina Code (2008) due to its effect on rare and endangered species. The staff found Regulation 30-11 of the South Carolina Code of Regulations (2011) implicated because the structure would "prevent the normal shoreline migration and the cycle of creation and subsequent in-fill of a tidal inlet" and because the development the structure would facilitate would "have a significant impact on the general character of the area."

Kiawah and the South Carolina Coastal Conservation League (League) both requested a final review conference before the DHEC Board, and the Board denied the request for a final review conference. Kiawah then requested a contested case hearing before the ALC challenging DHEC's denial of the remainder of the permit. The League also filed a request for a contested case hearing challenging DHEC's decision to authorize the 270 feet of bulkhead and revetment adjacent to the county park. The ALC held a contested case hearing at which the parties presented witnesses and exhibits in support of their positions.

The ALC ruled in favor of Kiawah, granting the permit for the full 2,783 feet of bulkhead and revetment, but modifying the requested permit in several ways. In so concluding, the ALC found the structure would not contravene any of the applicable statutes and regulations asserted by DHEC and the League. As to

---

[3] The County previously submitted its own permit request for an erosion control structure to extend only along the shoreline adjacent to the county park. Kiawah convinced the County to withdraw that permit application and allow it to submit the permit application at issue here to cover both the land leased to the County for the park and the larger extent of the Spit.

section 48-39-150, the ALC found its provisions satisfied because "there are no significant negative impacts" from the structure. Specifically, the ALC found "neither the bulkhead/revetment nor the potential limited residential development will result in any significant harm to the public resources or marine or other plant or animal life, nor significantly impair public access to critical areas." The ALC also found: "the project will clearly reduce and likely stop erosion rather than precipitate any erosion" and "[t]he elimination of that erosion will further provide an economic benefit to [Kiawah]" whereas the "erosion has no positive benefit for anyone."

The ALC found DHEC misconstrued its powers under regulation 30-11(C)(1) by interpreting the regulation as allowing it to consider a proposed structure's impacts outside the critical area. The ALC interpreted regulation 30-11(C)(1) as only permitting DHEC to consider impacts within the critical area. The ALC concluded there would be no material adverse effects from the structure and added: "Even though consideration of the effects of the upland is beyond the purview of the regulation, the Court concludes that there was no evidence adduced that the residential development would have any material adverse effects on the upland."

Considering whether the structure would contravene Regulation 30-12(C) of the South Carolina Code of Regulations (2011) because it would adversely affect public access, the ALC found that "the use of the bank by the public is limited" and that the effect on public access "is not substantial." Accordingly, the ALC concluded:

> [A]lthough public access to the riverbank at low tide may be affected on a very limited basis, Regulation 30-12(C) specifically allows some adverse effect where the "upland is being lost due to tidally induced erosion." Clearly, [Kiawah's] upland is being lost due to tidally induced erosion, and there is no feasible alternative that will stabilize this eroding riverbank. Additionally, although the [revetment] degrades the public uses of the shoreline where the mat is approved, it does not eliminate all public access.

Finally, the ALC also found the structure complies with regulation 30-11(C)(2), the public trust doctrine, and the Coastal Zone Management Plan. Accordingly, the ALC approved the permit issued by DHEC but deleted from the permit the limitation of the structure to 270 feet, thereby permitting the entire

2,783 feet of bulkhead and revetment as requested by Kiawah.  The ALC also modified the permit by inserting the following special conditions in order to reduce the structure's size and minimize its impacts:

1. Provided:

(i) that care is used in the installation of the requested erosion control structure near its eastern end, adjacent to Beachwalker Park, to avoid covering marsh grass, where practical, unless necessary to prevent significant highland erosion;

(ii) that, for the portion of the proposed erosion control structure to be located west of survey point "F" on [Kiawah's] Exhibit 77, a bulkhead shall not be used where the vertical face of the escarpment is less than 24 inches;

(iii) that, for this same western section of the proposed erosion control structure, the [revetment] shall be no greater than eight . . . feet in width; and,

(iv) that [Kiawah] shall submit final construction plans to [DHEC] consistent with the permit requested, as modified and approved by the [ALC's order], before commencing initial construction of the erosion control structure, and, after initial construction, prior to commencing construction of any necessary extensions of the [revetment] (or bulkhead to the extent herein authorized but not originally constructed) authorized by this permit.

DHEC and the League moved for reconsideration and the ALC denied their motions.  DHEC and the League then appealed to this Court.

### ISSUES PRESENTED

I.      Did the ALC err in finding the bulkhead and revetment would not contravene the Coastal Zone Management Act?

II.     Did the ALC err in finding the bulkhead and revetment would not contravene regulation 30-11?

III.   Did the ALC err in finding the bulkhead and revetment would not contravene regulation 30-12(C)?

## STANDARD OF REVIEW

In an appeal from an ALC decision, the Administrative Procedures Act provides the appropriate standard of review.  S.C. Code Ann. § 1-23-610(B) (Supp. 2012).  This Court confines its analysis of an ALC decision to whether it is:

(a)   in violation of constitutional or statutory provisions;

(b)    in excess of the statutory authority of the agency;

(c)   made upon unlawful procedure;

(d)   affected by other error of law;

(e)   clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(f)   arbitrary or capricious or characterized by an abuse of discretion or clearly unwarranted exercise of discretion.

*Id.*  In determining whether the ALC's decision was supported by substantial evidence, the Court need only find, looking at the entire record on appeal, evidence from which reasonable minds could reach the same conclusion as the ALC.  *Hill v. S.C. Dep't of Health & Envtl. Control*, 389 S.C. 1, 9–10, 698 S.E.2d 612, 617 (2010).  However, the Court may reverse the decision of the ALC where it is in violation of a statutory provision or it is affected by an error of law.  *Alltel Commc'ns, Inc. v. S.C. Dep't of Revenue*, 399 S.C. 313, 316, 731 S.E.2d 869, 870-71.

## LAW/ANALYSIS

Before delving into the particular grounds for appeal, we need acknowledge that the basic premise undergirding our analysis must be the public trust doctrine which provides that those lands below the high water line are owned by the State and held in trust for the benefit of the public.  *Estate of Tenney v. S.C. Dep't of Health & Envtl. Control*, 393 S.C. 100, 106, 712 S.E.2d 395, 398 (2011) ("Under the public trust doctrine, the State holds presumptive title to tidal land below the

high water mark to be held in trust for the benefit of all people of South Carolina."). While all citizens may use and enjoy these lands subject to the State's control, no citizen has an inherent right to take possession of or alter these lands.[4] Accordingly, the public's interest must be the lodestar which guides our legal analysis in regards to the State's tidelands. Recognizing that permitting alteration of the tidelands may be in the public's interest in limited circumstances, the State enacted statutes and promulgated regulations which generally prohibit alterations to the tidelands except when the public interest requires otherwise. *See* The Coastal Zone Management Act (CZMA), Title 48, Chapter 39 of the South Carolina Code (2008 & Supp. 2012); Chapter 30 of the South Carolina Code of Regulations (2011); The Coastal Zone Management Program (CZMP), South Carolina Department of Health and Environmental Control, http://www.scdhec.gov/environment/ocrm/czmp.htm. However, simply because the State permits alterations in limited circumstances does not change the fact that altering tidelands remains the exception to the rule. The State, through the General Assembly, has adopted the policy that the public interest is usually best served by preserving tidelands in their natural state. *See* S.C. Code Ann. §§ 48-39-20 to -30 (2008).

## I.  THE COASTAL ZONE MANAGEMENT ACT

We hold the ALC erred as a matter of law in finding the proposed bulkhead and revetment comply with the requirements of the CZMA. Pursuant to Section 48-39-150 of the South Carolina Code (2008 & Supp. 2012), in determining whether to grant or deny a permit to alter the critical area, DHEC must find the project complies with the policies set forth in sections 48-39-20 and 48-39-30, as well as with ten "general considerations" set forth in section 48-39-150.

Specifically, section 48-39-30(D) provides:

Critical areas shall be used to provide the combination of uses which will insure [sic] the maximum benefit to the people, but not necessarily a combination of uses which will generate measurable maximum dollar benefits. As such, the use of a critical area for one or

---

[4] Of course, an exception to the rule exists for citizens who have ownership of tidelands based on a grant from the sovereign. *See Hobonny Club, Inc. v. McEachern*, 272 S.C. 392, 396, 252 S.E.2d 133, 135–36 (1979).

a combination of like uses to the exclusion of some or all other uses shall be consistent with the purposes of this chapter.

While section 48-39-30(D), as applied through section 48-39-150, explicitly requires that tidelands be used in a way that provides maximum public benefit, the ALC made no findings of any public benefit that would result from the bulkhead and revetment. Quite to the contrary, it was clear that only the developer, not the *public*, would benefit from the construction of this enormous bulkhead and revetment.

The ALC found section 48-39-30(D)'s public benefit requirement satisfied through the financial benefit to be realized by Kiawah. In our view, the ALC's analysis of this issue represents a basic misinterpretation of the term "the people" in section 48-39-30(D) because it failed to identify any benefit flowing to the public at large, instead stating only that "elimination of [the] erosion will further provide an economic benefit to [Kiawah]." Kiawah is not synonymous with "the people." When that term is correctly construed, any benefit to Kiawah is irrelevant to whether section 48-39-30(D) is satisfied. "The people," as used here, is a term meaning the citizens of a particular jurisdiction. That interpretation derives from the commonly understood definition of "the people" as "[t]he mass of ordinary persons; the populace." *The American Heritage Dictionary* 919 (2d College ed. 1982). Additionally, the use of the article "the" before "people" indicates that "the people" is a single, unified thing. *See Centex Int'l, Inc. v. S.C. Dep't of Revenue*, 406 S.C. 132, 142, 750 S.E.2d 65, 70 (2013) ("The word '*the*' is a word of limitation—a word used before nouns, with a specifying or particularizing effect, opposed to the indefinite or generalizing force of 'a' or 'an.'" (quoting *People v. Enlow*, 310 P.2d 539, 546 (Colo. 1957))). Reading the provision in light of the public trust doctrine—the legal bedrock upon which the statute rests—bolsters the conclusion that "the people" should be construed as the public at large rather than a single developer. The public trust doctrine provides that tidelands are to be held in trust for the benefit of "*all* people of South Carolina." *Estate of Tenney*, 393 S.C. at 106, 712 S.E.2d at 398 (emphasis added). To allow the benefits to a private developer to override the interests of the people of South Carolina undermines the

statute and defeats the very purpose of the public trust doctrine. Thus, only those benefits which inure to the public as a whole may satisfy section 48-39-30(D).[5]

Compounding this error is the fact that the ALC wrongly found that "[t]his erosion has no positive benefit for anyone."[6] To the contrary, undisputed evidence presented before the ALC established that the accretion of a spit followed by the erosion of the neck of the spit and the formation of a new inlet is a natural process that has occurred repeatedly at Captain Sam's Inlet for centuries. In fact, as recently as the 1940s, the spit had breached and did not exist. The legislature codified in the CZMA its finding that in South Carolina there is an "urgent need to protect and to give high priority to natural systems in the coastal zone." S.C. Code Ann. § 48-39-20(F). Thus, the CZMA provides that it is to the public's benefit to protect natural processes like the cyclical erosion, breach, and accretion process of the spit. This is borne out by the evidence that the repetitive accretion of Captain Sam's Spit, followed by the erosion of the neck of the spit served as the supply of sand for Seabrook Island to the southwest. As recognized by the General Assembly, there is often great value in allowing nature to take its course, rather than having our coast become an armored, artificial landscape. *See id.*; Meg Caldwell & Craig Holt Seagall, *No Day at the Beach: Sea Level Rise, Ecosystem Loss, and Public Access Along the California Coast*, 34 Ecology L.Q. 533, 539–40 (2007) (explaining why "[a] fortified coast comes with major financial, social, and ecological costs"). For those reasons, the ALC erred in finding section 48-39-30(D)'s public benefit requirement satisfied.

## II.   REGULATION 30-11

In determining whether to grant a permit for alteration of a critical area, regulation 30-11(C)(1) requires DHEC to consider: "The extent to which long-range, cumulative effects of the project may result within the context of other possible development and the general character of the area." DHEC has

---

[5] Contrary to the dissent's characterization, we do not exclude the developer from being included in "the people." Rather, our point is that the ALC erred in considering only the benefits to the developer to the exclusion of the public as a whole.

[6] Similarly and also erroneously, the ALC held "the General Assembly specifically recognized the need to protect upland from destruction from the natural process of erosion on tidal rivers."

interpreted this regulation as requiring it to consider not only a proposed project's impact on the critical area, but also the project's impacts on upland areas within the larger coastal zone.

The ALC rejected DHEC's interpretation, concluding

[T]he pertinent inquiry is the cumulative impacts of the project *within* the critical area, not the impact of future development on the high ground *outside* the critical area. In other words, the area for which [DHEC] has regulatory authority is the critical area, not the high ground *outside* the critical area.

In reaching this conclusion, the ALC erred by failing to give deference to DHEC's interpretation of its regulation. Interpreting and applying statutes and regulations administered by an agency is a two-step process. First, a court must determine whether the language of a statute or regulation directly speaks to the issue. If so, the court must utilize the clear meaning of the statute or regulation. *See Brown v. Bi-Lo, Inc.*, 354 S.C. 436, 440, 581 S.E.2d 836, 838 (2003) ("We recognize the Court generally gives deference to an administrative agency's interpretation of an applicable statute or its own regulation. Nevertheless, where, as here, the plain language of the statute is contrary to the agency's interpretation, the Court will reject the agency's interpretation." (citations omitted)); *Brown v. S.C. Dep't of Health & Envtl. Control*, 348 S.C. 507, 515, 560 S.E.2d 410, 414 (2002) ("Where the terms of the statute are clear, the court must apply those terms according to their literal meaning."). If the statute or regulation "is silent or ambiguous with respect to the specific issue," the court then must give deference to the agency's interpretation of the statute or regulation, assuming the interpretation is worthy of deference. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984); *see also Brown v. Bi-Lo*, 354 S.C. at 440, 581 S.E.2d at 838. [7]

---

[7] In *Chevron*, the landmark administrative law case, the United States Supreme Court summarized the two-step process as:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter,

The language of regulation 30-11(C)(1) is ambiguous in terms of the scope of the "area" DHEC may consider in making permitting decisions. Therefore, the ALC should have proceeded to the second step and determined whether DHEC's interpretation is entitled to deference.

Advancing to the second step, we must first consider the scope of South Carolina's deference doctrine. In this State, the doctrine can be traced back to *Read Phosphate Co. v. South Carolina Tax Commission*, 169 S.C. 314, 168 S.E. 722 (1933), where this Court adopted the deference doctrine from United States Supreme Court precedent, stating: "'The construction given to a statute by those charged with the duty of exercising it is always entitled to the most respectful consideration, and ought not to be overruled without cogent reasons.'" *Id.* at 330, 168 S.E. at 728 (quoting *United States v. Moore*, 95 U.S. 760, 763 (1877)). The Court, again relying on federal case law, stated the rationale for the rule as: "'The officers concerned are usually able men, and masters of the subject. Not unfrequently they are the draftsmen of the laws they are . . . called upon to interpret.'" *Id.* (quoting *Moore*, 95 U.S. at 763). Thus, we give deference to agencies both because they have been entrusted with administering their statutes and regulations and because they have unique skill and expertise in administering those statutes and regulations.

---

for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43; *see also Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945) (holding that "if the meaning of the words used [in a regulation] is in doubt," "a court must necessarily look to the administrative construction of the regulation," and the agency's interpretation of its own regulation "becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation").

As repeatedly stated in our decisions, our deference doctrine provides that courts defer to an administrative agency's interpretations with respect to the statutes entrusted to its administration or its own regulations "unless there is a compelling reason to differ." *S.C. Coastal Conservation League*, 363 S.C. at 75, 610 S.E.2d at 486; *see also, e.g.*, *Barton v. S.C. Dep't of Prob., Parole & Pardon Servs.*, 404 S.C. 395, 415, 745 S.E.2d 110, 121 (2013) (stating that an agency's interpretation "will not be overruled absent compelling reasons" (quoting *Dunton*, 291 S.C. at 223, 353 S.E.2d at 133)); *CFRE, LLC v. Greenville Cnty. Assessor*, 395 S.C. 67, 77, 716 S.E.2d 877, 882 (2011) (same); *Buist v. Huggins*, 367 S.C. 268, 276, 625 S.E.2d 636, 640 (2006) (same); *Brown v. S.C. Dep't of Health & Envtl. Control*, 348 S.C. at 515, 560 S.E.2d at 414 (same); *Glover by Cauthen v. Suitt Constr. Co.*, 318 S.C. 465, 469, 458 S.E.2d 535, 537 (1995) (same); *Faile v. S.C. Employment Sec. Comm'n*, 267 S.C. 536, 540, 230 S.E.2d 219, 222 (1976) (stating that an agency's interpretation will not be overruled "without cogent reasons"); *Hadden v. S.C. Tax Comm'n*, 183 S.C. 38, 48, 190 S.E 249, 253 (1937) (stating that an agency's interpretation "will not be overruled without cogent reasons").

Accordingly, the deference doctrine properly stated provides that where an agency charged with administering a statute or regulation has interpreted the statute or regulation, courts, including the ALC, will defer to the agency's interpretation absent compelling reasons. We defer to an agency interpretation unless it is "arbitrary, capricious, or manifestly contrary to the statute."[8] *Chevron*, 467 U.S. at 844.

---

[8] While we take this opportunity to clarify and distill our deference doctrine, we have not changed the existing doctrine as evidenced by the plethora of decisions by South Carolina courts applying the doctrine consistent with our understanding. *See, e.g.*, *Jasper Cnty. Tax Assessor v. Westvaco Corp.*, 305 S.C. 346, 348, 409 S.E.2d 333, 334 (1991) ("We find Tax Commission's interpretation of § 12-43-230(a) reasonable and conclude there is no compelling reason to overrule it."); *Captain's Quarters Motor Inn, Inc. v. S.C. Coastal Council*, 306 S.C. 488, 490, 413 S.E.2d 13, 14 (1991) ("Moreover, we find Coastal Council's construction of the statute reasonable and find no compelling reason to overrule it."); *Howard v. Owen Steel Co.*, 303 S.C. 304, 305, 400 S.E.2d 149, 149 (1991) (finding no compelling reason to not defer to an agency's interpretation and accordingly, deferring to the interpretation); *Dunton*, 291 S.C. at 223, 353 S.E.2d at 133 (finding "[t]he Circuit Court's order cites no compelling reasons for rejecting the Board of Examiners'

Here, DHEC's interpretation is neither arbitrary, capricious, nor manifestly contrary to the statute. To the contrary, DHEC's interpretation is reasonable and consistent with its statutory authority. Under the CZMA, DHEC was required to develop a comprehensive coastal zone management program—the CZMP—for the coastal zone, and was given responsibility to enforce and administer the CZMP. *See* S.C. Code Ann. § 48-39-80 (2008); *Spectre, LLC v. S.C. Dep't of Health & Envtl. Control*, 386 S.C. 357, 688 S.E.2d 844 (2010). DHEC was also required by statute to promulgate regulations to execute the CZMP. S.C. Code Ann. § 48-39-80. Parts of the CZMA explicitly require DHEC to consider the larger coastal zone. As previously discussed, section 48-39-150 requires DHEC to consider the policies set forth in section 4-39-20 and those policies repeatedly refer to the coastal zone. The CZMA also provides that the "basic state policy" behind the Act is to "protect the quality of the coastal environment and to promote the economic and social improvement of the *coastal zone* . . . ." S.C. Code Ann. § 48-39-30. Therefore, DHEC's interpretation is sound because it cannot be expected to protect

---

interpretation of these statutes . . . .," and thus, holding "the Circuit Court erred in rejecting the Board of Examiners' interpretation . . . ."); *Faile*, 267 S.C. at 540, 230 S.E.2d at 221–22 (finding no cogent reason to not give deference to an agency's interpretation and accordingly, deferring to the interpretation); *Barton v. Higgs*, 372 S.C. 109, 118, 641 S.E.2d 39, 44 (Ct. App. 2007) (after finding that the agency's interpretation did not conflict with the literal meaning of the statute, concluding there was no compelling reason to not defer, and thus, giving deference to the agency's interpretation); *Comm'rs of Pub. Works v. S.C. Dep't of Health & Envtl. Control*, 372 S.C. 351, 361, 641 S.E.2d 763, 768 (Ct. App. 2006) ("We find the statute is ambiguous and, therefore, defer to the Board's interpretation. . . . We find no compelling reasons to overrule the Board's interpretation as it is neither arbitrary nor capricious, and does not constitute an abuse of discretion."); *Koenig v. S.C. Dep't of Pub. Safety*, 325 S.C. 400, 405, 480 S.E.2d 98, 100 (Ct. App. 1996) (deferring to agency's interpretation after concluding it was "reasonable"); *Ruocco v. S.C. State Bd. of Registration for Prof'l Eng'rs & Land Surveyors*, 314 S.C. 111, 115, 441 S.E.2d 829, 831 (Ct. App. 1994) (finding "no compelling reason to reject the Board's interpretation of the statute" and thus, deferring to the Board's interpretation). Therefore, contrary to the dissent's charge, our view does not "fundamentally undermine" any longstanding approach and is instead faithful to our precedent.

the coastal zone as instructed by the General Assembly if it cannot consider how projects within the critical area may affect the broader coastal zone.[9]

Additionally, the ALC in part based the rejection of DHEC's interpretation on the premise that to accept it would improperly permit DHEC to "trump local zoning and development agreements" and control the uses of upland areas. This too was erroneous. No party has ever asserted that regulation 30-11 gives DHEC such powers, nor could the regulation confer upon DHEC such powers. DHEC's role under regulation 30-11 is limited solely to *consideration* of upland impacts. Regulation 30-11 does not give DHEC any power to prohibit upland development; rather, DHEC only has the power to grant or deny a permit for a project in the critical area, and that decision may be based in part on the upland impacts that would result from the project. Accordingly, the ALC erred in failing to give deference to DHEC's interpretation and construing regulation 30-11(C)(1) as not permitting consideration of upland impacts.

In an apparent attempt to insulate its holding from error, the ALC presented an alternative holding in which it purported to consider upland impacts. However, that consideration was fundamentally flawed. Accordingly, the error was not harmless and requires reversal.

The ALC summarily concluded there would be no upland impacts flowing from the construction of the revetment and bulkhead.[10] This conclusion is plainly

---

[9] Moreover, DHEC has consistently interpreted its regulatory power as limited to the critical area but requiring consideration of the larger coastal zone. The CZMP provides:

> Two types of management authority are granted in two specific areas of the State. [DHEC] has direct control through a permit program over critical areas . . . . Direct permitting authority is specifically limited to these critical areas. Indirect management authority of coastal resources is granted to [DHEC] in . . . the coastal zone.

South Carolina Coastal Zone Management Program, II-2 (1972), available at http://www.scdhec.gov/environment/ocrm/czmp.htm.

[10] The ALC's alternative holding as to uplands impact consisted only of the following:

contradicted by the evidence presented. Uncontroverted evidence was introduced of Kiawah's intent to build homes on Captain Sam's Spit following the construction of the proposed bulkhead and revetment. Thus, the upland area of the spit is to be transformed from a completely natural area into a residential development. While the ALC found the development would be "sensitively planned," that finding does not obviate the error intrinsic in the ALC's decision—that there would be no impact on the upland here.

Thus, not only did the ALC err in holding that regulation 30-11 did not permit consideration of upland impacts, its alternative holding whereby it purported to consider upland impacts was also erroneous and reversal is required.

---

Additionally, in this instance, the potential residential development will not have deleterious impacts even if the Court were to consider the effects of potential residential development. [DHEC's Office of Ocean and Coastal Resource Management (OCRM)] and [the League] do not challenge [Kiawah's] history of environmentally sensitive development methods, permit adherence record, or any of the specific strategies, methods, and approaches that [Kiawah] will use in its limited residential development of Captain Sam's. Rather, they urge that **any** residential development at all, regardless of safeguards and protections, on the now-undeveloped Captain Sam's highland peninsula along the ocean and river, is **per se** "ill-planned." The Court concludes that the numerous measures and safeguards [Kiawah] intends to utilize in its development of Captain Sam's demonstrate that this limited residential use would be sensitively planned, responsive to the natural features of the peninsula, attentive to its flora and fauna, and without significant negative effects on the critical area. Even though consideration of the effects of [sic] the upland is beyond the purview of the regulation, the Court concludes that there was no evidence adduced that the residential development would have any material adverse environmental effects on the upland. The development team also has a twenty-two year unblemished "track record" for compliance with all OCRM permits.

## III.    REGULATION 30-12(C)

The appellants also challenge the ALC's holding that regulation 30-12(C) which creates public access requirements for bulkheads and revetments was satisfied.  Specifically, the appellants contend the ALC erred in finding the project would have no adverse effect on public access and there is no feasible alternative. We agree.

The public access requirements of regulation 30-12(C) provide:

(c) Bulkheads and revetments will be prohibited where marshlands are adequately serving as an erosion buffer, where adjacent property could be detrimentally affected by erosion or sedimentation, or where public access is adversely affected unless upland is being lost due to tidally induced erosion.

(d) Bulkheads and revetments will be prohibited where public access is adversely affected unless no feasible alternative exists.

The ALC found any adverse effect on public access caused by the proposed bulkhead and revetment would be so insignificant it would not implicate the requirements of regulation 30-12(C).  Additionally, the ALC found that even if there was a sufficient effect on public access, regulation 30-12(C) was satisfied because upland was being lost to erosion and no feasible alternatives exist.

While we find substantial evidence exists to support the ALC's finding that upland is being lost due to tidally induced erosion, we believe the ALC erred both in finding that public access would not be adversely affected and that no feasible alternatives exist.

### A.    Adverse Effects on Public Access

The ALC's order essentially acknowledges that public access would be adversely affected by the proposed bulkhead and revetment, finding "public access to the riverbank at low tide may be affected on a very limited basis" and "the [articulated concrete block] mat degrades the public uses of the shoreline where the mat is approved."  However, the ALC erroneously read the regulation as requiring consideration of the degree to which public access is affected, concluding that

regulation 30-12(C) is not implicated when the adverse effect on public access is insubstantial.

The ALC erred in inserting a substantiality requirement into the regulation. With the exception of a *de minimis* effect which cannot be argued here, the regulation is implicated whenever a proposed bulkhead or revetment would have an adverse effect on public access. That reading is supported not only by the plain language of the regulation, but also by the statutory and common law basis for it.

By its terms the regulation applies "where public access is adversely affected." The language of the regulation contains no indication that the adverse effect on public access must be substantial; rather, it only states that public access must be affected. Our role is to apply and interpret, not rewrite, regulations. Where the language of a regulation is plain, unambiguous, and conveys a clear and definite meaning, interpretation of the regulation is unnecessary and improper. *See Murphy v. S.C. Dep't of Health & Envtl. Control*, 396 S.C. 633, 639, 723 S.E.2d 191, 195 (2012) ("Regulations are interpreted using the same rules of construction as statutes."); *Paschal v. State Election Comm'n*, 317 S.C. 434, 436, 454 S.E.2d 890, 892 (1995) ("If a statute's language is plain and unambiguous, and conveys a clear and definite meaning, there is no occasion for employing rules of statutory interpretation and the court has no right to look for or impose another meaning. Where the terms of the statute are clear, the court must apply those terms according to their literal meaning." (citation omitted)). To read a substantiality requirement into the regulation ignores its clear wording and effectively rewrites the regulation.

Furthermore, reading regulation 30-12(C) as not containing a substantiality requirement and considering the entirety of the regulation, it presents a nuanced balancing of economic and environmental, and public and private considerations. This balancing neatly comports with the statutory foundation for the regulation and solidifies our conclusion that this is the correct interpretation of the regulation. In order to protect public access, the regulation limits when bulkheads or revetments that affect public access may be permitted. The regulation does not prohibit outright any bulkhead or revetment that would adversely affect public access; rather, it balances the need for public access against the need for a bulkhead or revetment. It does so by providing that a bulkhead or revetment that affects public access may still be permitted where upland is being lost due to tidally induced erosion and no feasible alternative exists.

The balancing provided by regulation 30-12(C) is not only supported by the CZMA and the public trust doctrine foundation for the CZMA, but more closely comports with those policies than a substantiality requirement. A substantiality requirement would improperly favor private interests over public interests in contravention of the CZMA and the public trust doctrine. It seems to begin with the principle that bulkheads and revetments should be built and the burden is on the State, representing the public interest, to prove that the structure should not be built. This skews the consideration in favor of the private interest, treating public lands as if they are held in trust waiting for private development, rather than held in trust for the public to use as they truly are.

Such an elevation of economic development over the importance of public access would also be inconsistent with the significance the CZMA accords to public access. The CZMA's focus on protecting public access from economic development is evidenced by its findings that "the coastal zone is rich in a variety of natural, commercial, *recreational* and industrial resources" and that "[t]he increasing and competing demands upon the lands and waters of our coastal zone occasioned by population growth and economic development . . . have resulted in . . . decreasing open space for public use . . . ." S.C. Code Ann. § 48-39-20(A), (B) (emphasis added). As previously discussed, the CZMA provides that "[c]ritical areas shall be used to provide the combination of uses which will insure [sic] the maximum benefit to the people . . . ." S.C. Code Ann. § 48-39-30(D). The CZMA also enumerates specific factors to consider in deciding whether to grant or deny a permit which include:

> (5) The extent to which the development could affect existing public access to tidal and submerged lands, navigable waters and beaches or other recreational coastal resources.
>
> . . .
>
> (7) The extent of the economic benefits *as compared with* the benefits from preservation of an area in its unaltered state.

S.C. Code Ann. § 48-39-150 (emphasis added). Considering those statutory provisions, we believe the CZMA was intended to achieve a balance between environmental and public considerations on the one hand and economic and private considerations on the other. However, it recognizes that environmental and public considerations had historically been sacrificed at the altar of economic

development and must be protected going forward.[11]  Regulation 30-12(C) fulfills those statutory goals by protecting public access while balancing the need for public access against economic development.

Regulation 30-12(C)'s balancing also comports with the public trust doctrine which is the guiding principle behind the CZMA.  Under that doctrine, any use of tidelands must be to the public benefit, which is embodied in section 48-39-30(D)'s "maximum benefit" to the public requirement.  Therefore, as reflected in regulation 30-12(C), public access is to be accorded great protection while private economic development is suspect and only permitted when in the public interest.  For those reasons, we hold the ALC erred in finding regulation 30-12(C) was not applicable because there would be no substantial adverse effect on public access.

Moreover, even if we were to accept the ALC's conclusion that regulation 30-12(C) is only implicated when there is a substantial impact on public access, we believe the ALC's finding that the impact on public access will be insignificant is not supported by substantial evidence, and thus, reversal is still required.  If there ever were a case of a substantial adverse effect on public access, it is this case.  The undisputed evidence at trial established that the effect of the proposed bulkhead and revetment would be to cover 2,783 feet by 40 feet——over 9 football fields in length and an area of over 2.5 acres—of sandy beach with concrete.  That stretch of sandy beach, a rare feature for a tidal river, is the only sandy beach on the Kiawah River.  When the sandy beach is replaced by the

---

[11] The General Assembly expressed this sentiment in its legislative finding that:

> The increasing and competing demands upon the lands and waters of our coastal zone occasioned by population growth and economic development, including requirements for industry, commerce, residential development, recreation, extraction of mineral resources and fossil fuels, transportation and navigation, waste disposal and harvesting of fish, shellfish and other living marine resources have resulted in the decline or loss of living marine resources, wildlife, nutrient-rich areas, permanent and adverse changes to ecological systems, decreasing open space for public use and shoreline erosion.

S.C. Code Ann. 48-39-20(B) (2008).

enormous concrete revetment, members of the public will not be able to walk or land a boat or kayak on it as they have done in the past.

Also, in view of the uncontroverted evidence, the ALC's conclusion that public use of the beach is insignificant is not supported by substantial evidence.[12] All of the evidence presented at the hearing was that the public regularly uses the beach for a variety of recreational purposes. Dr. Greg VanDerwerker testified that he kayaks in the Kiawah River a couple of times per month and each trip he pulls his kayak out onto the beach where the revetment would be constructed. While there, he routinely observes others using the beach as a place to land their kayaks and to fish. Sophia McAllister testified that she kayaks in the Kiawah River on a weekly basis and regularly swims near the bank of the river where the revetment would be located. Sidi Limehouse testified that he goes to the spit once or twice per year and pulls his boat up on the beach where the revetment would exist. He also testified that he has taken several groups of people out to the spit in recent years. Bill Eiser, the DHEC project manager assigned to Kiawah's permit application, testified that he conducted four site visits in order to review the project area and observed people walking on the beach, kayaks pulled up on the beach, and people fishing or crabbing from the beach. Thus, the record establishes that the public use of the beach was much more significant than the "limited" use ascribed to it by the ALC.

The ALC's misapprehension about public use and the failure to accord it the importance it deserves is fundamentally at odds with the public nature of the tidelands at issue here. Accordingly, we hold the ALC erred in interpreting regulation 30-12(C) as only applying where there would be a substantial impact on public access, in finding there would be no adverse effect on public access, and in finding the public did not use the critical area where the bulkhead and revetment would be constructed. For those reasons, reversal is warranted.

### B.    Feasible Alternatives

Finally, the ALC's consideration of feasible alternatives was erroneous in two respects. First, the ALC erred in only considering alternatives that would stop

_____

[12] While not at issue here because the public uses the banks of the Kiawah River along Captain Sam's Spit, we note the regulation does not require that the public's actual use of particular portions of the critical area be adversely affected, rather it only requires that the public's *access* to the critical area be adversely affected.

the natural erosion process. The ALC addressed feasible alternatives in one sentence: "Clearly, [Kiawah]'s upland is being lost due to tidally induced erosion, and there is no feasible alternative that will stabilize this eroding riverbank." As that limited analysis makes clear, the ALC only considered alternatives that would "stabilize this eroding riverbank." That constrained analysis directly contravenes the CZMA and applicable regulations and thus, was erroneous.

As previously discussed, the CZMA specifically provides for and encourages the preservation of natural processes. Pointedly, the General Assembly's findings expressed in the CZMA state that there is an "urgent need to protect and to give high priority to natural systems in the coastal zone," and the accretion, erosion, and breach of the spit is a natural system. S.C. Code Ann. § 48-39-20(F). In fact, the term "feasible alternatives" is specifically defined in the CZMA to include "a 'no action' alternative." 2 S.C Code Ann. Regs. 30-1(D)(23) (2011). Thus, in applying regulation 30-12(C), the feasibility of taking no action and permitting natural processes to continue should not be given short shrift but rather must be given serious consideration.

Additionally, the ALC found the "evidence did not establish that there was a feasible alternative to the bulkhead/revetment that would stabilize the river shoreline . . . ." The ALC thereby erroneously placed the burden on DHEC and the League to show there were no feasible alternatives. Regulation 30-12(C) creates a presumption that a structure which will adversely affect public access is prohibited unless the applicant shows there are no feasible alternatives, and thus the burden to show the structure fits within an exception to the prohibition falls on the applicant, here Kiawah.

Therefore, we reverse the ALC's order as to regulation 30-12(C) because it was error to fail to accord sufficient consideration to the feasibility of taking no action and permitting the natural process to continue unabated and to place the burden to show the lack of a feasible alternative on DHEC and the League.

## CONCLUSION

Captain Sam's Spit and the public tidelands along its margins are of great importance to the people of South Carolina. The tidelands present a bounty of benefits to the people ranging from environmental to recreational. Unlike much of our State's coastline which is now armored and unnatural, the spit remains untouched by human alteration. The area, particularly the pristine sandy beach, is

undoubtedly one of this State's natural treasures.  Admittedly, this alone is not a valid reason to reverse the ALC's approval of a permit to construct a huge bulkhead and revetment there.

However, reversal is warranted due to the several errors of law committed by the ALC.  First, the CZMA requires that uses of the public tidelands be to "the maximum benefit to the people," but the ALC did not consider whether and to what extent the public would benefit from the proposed structure as opposed to leaving the tidelands in their natural state.  Accordingly, the ALC erred in finding section 48-39-150 satisfied.  Second, the ALC erred in finding the project met the requirements of regulation 30-11 both because that regulation requires consideration of the factors in section 48-39-150 and because the ALC's consideration of upland impacts was flawed.  Finally, the ALC erred in finding regulation 30-12(C) satisfied because this finding is tainted by the erroneous conclusion that there was no adverse effect on public access and the failure to consider the alternative of leaving the critical area in its natural state.  For all of those reasons, we reverse and remand for further consideration consistent with this decision.

**PLEICONES and BEATTY, JJ., concur.  TOAL, C.J., dissenting in a separate opinion in which KITTREDGE, J., concurs.**

**CHIEF JUSTICE TOAL:**  This will be the third time this Court has issued divided opinions on this matter.  This tortured procedural history underscores the deep division within this Court regarding the proper role of the judicial branch of government in reviewing final administrative decisions of an executive branch agency under the Constitution of South Carolina and under the statutory law of our state.

My disagreement with the majority is not in any way intended as a criticism of the majority opinion's very learned review of the development of environmental protection laws in South Carolina.  As a young lawyer, I brought several cases seeking to invoke the public trust doctrine to prevent unrestrained construction in the coastal zone.  As a member of the General Assembly, I co-sponsored and floor led "Tidelands" legislation that resulted in the enactment of the Coastal Zone Management Act and the creation of the Coastal Council as a regulatory authority.  As a judge, I must temper my support of environmental protection policy considerations with the requirements of our state Constitution regarding due process in administrative proceedings.

In 1993, the increased use of agency regulatory authority in South Carolina was balanced by the creation of a professional Administrative Law Court (the ALC) as the final decision maker for contested regulatory litigation within executive branch agencies.  The ALC was created to provide for a cadre of neutral hearing officers not employed exclusively by or tethered to any specific agency.  The General Assembly was motivated by its desire to achieve the fairness in administrative hearings mandated by Article I, § 22 of the South Carolina Constitution.  Today, the majority reverses the administrative law judge in this case on the ground that he wrongly failed to defer to the decision of the DHEC staff regarding the permit contested here.

With the best of intentions, the majority's view of deference to the opinions of an agency bureaucracy on not only facts but also on the agency's interpretation of statutory law fundamentally undermines South Carolina's longstanding approach to controlling unrestrained bureaucratic decisions regarding private property rights.

Accordingly, I am compelled to dissent.  I would affirm the ALC's decision authorizing Kiawah to construct a proposed bulkhead and revetment structure (the proposed structure) on the Spit on Kiawah Island at the size specified in its order.

ANALYSIS

**I.    *CZMA & CZMP***

Because, in my opinion, the ALC properly considered the relevant statutes and made detailed findings of fact to support its conclusions, I would hold that the ALC did not err in concluding that the proposed structure complies with sections 48-39-20, -30, and -150 of the South Carolina Code.

## A. The CZMA

The CZMA expresses the General Assembly's intent to protect the coastal zone.  *See* S.C. Code Ann. § 48-39-10 to -360. (2008 & Supp. 2013).  The General Assembly defined the coastal zone as

> all coastal waters and submerged lands seaward to the State's jurisdictional limits and all lands and waters in the counties of the State which contain any one or more of the critical areas.  These counties are Beaufort, Berkeley, Charleston, Colleton, Dorchester, Horry, Jasper and Georgetown.

*Id.* § 48-39-10(B).  Additionally, the General Assembly defined "critical areas," like that in this case, as any of the following:

> (1) coastal waters;
>
> (2) tidelands;
>
> (3) beaches;
>
> (4) beach/dune system which is the area from the mean high-water mark to the setback line as determined in Section 48-39-280.

*Id.* § 48-39-10(J).

Section 48-39-20 of the South Carolina Code contains the "legislative declaration of findings," explaining the General Assembly's intent to control the regulation of critical coastal zone areas by developing a management program.  *Id.* § 48-39-20(C) ("The key to accomplishing this is to encourage the state and local governments to exercise their full authority over the lands and waters in the coastal

zone.").  The General Assembly noted the coastal zone's important features in finding:

> (E) Important ecological, cultural, natural, geological and scenic characteristics, industrial, *economic and historical values in the coastal zone are being irretrievably damaged* or lost by ill-planned development that threatens to destroy these values.

> (F) In light of competing demands and the *urgent need to protect and to give high priority to natural systems in the coastal zone while balancing economic interests*, present state and local institutional arrangements for planning and regulating land and water uses in such areas are inadequate.

*Id.* § 48-39-20(E), (F) (emphasis added).  Consequently, the General Assembly provided specific guidance regarding proposed development of critical areas:

> Critical areas shall be used to provide the combination of uses which will insure the maximum benefit to the people, but not necessarily a combination of uses which will generate measurable maximum dollar benefits. As such, the use of a critical area for one or a combination of like uses to the exclusion of some or all other uses shall be consistent with the purposes of this chapter.

*Id.* § 48-39-30(D).  The General Assembly intended DHEC to rely on the policy statements contained in sections 48-39-20 and 48-39-30, and ten general considerations found in section 48-39-150 when reviewing a permit to utilize a critical area.  *See id.* § 48-39-150 ("In determining whether a permit application is approved or denied [DHEC] shall base its determination on the individual merits of each application, the policies specified in Sections 48-39-20 and 48-39-30 and be guided by the following general considerations.").  Those ten general considerations require DHEC consider:

> (1) The extent to which the activity requires a waterfront location or is economically enhanced by its proximity to the water.

> (2) The extent to which the activity would harmfully obstruct the natural flow of navigable water. If the proposed project is in one

or more of the State's harbors or in a waterway used for commercial navigation and shipping or in an area set aside for port development in an approved management plan, then a certificate from the South Carolina State Ports Authority declaring the proposed project or activity would not unreasonably interfere with commercial navigation and shipping must be obtained by the department prior to issuing a permit.

(3) The extent to which the applicant's completed project would affect the production of fish, shrimp, oysters, crabs or clams or any marine life or wildlife or other natural resources in a particular area including but not limited to water and oxygen supply.

(4) The extent to which the activity could cause erosion, shoaling of channels or creation of stagnant water.

(5) The extent to which the development could affect existing public access to tidal and submerged lands, navigable waters and beaches or other recreational coastal resources.

(6) The extent to which the development could affect the habitats for rare and endangered species of wildlife or irreplaceable historic and archeological sites of South Carolina's coastal zone.

(7) The extent of the economic benefits as compared with the benefits from preservation of an area in its unaltered state.

(8) The extent of any adverse environmental impact which cannot be avoided by reasonable safeguards.

(9) The extent to which all feasible safeguards are taken to avoid adverse environmental impact resulting from a project.

(10) The extent to which the proposed use could affect the value and enjoyment of adjacent owners.

*Id.* § 48-39-150.

In the text of its decision, the ALC listed these ten general considerations and explained that the evidence presented at the de novo hearing demonstrated the

proposed structure complied with those considerations, and would not result in an adverse environmental impact. The ALC then analyzed the proposed structure in light of the policy statements of sections 48-39-20 and -30 of the South Carolina Code.

As referenced *supra*, in section 48-39-20, the General Assembly noted that the coastal zone is rich in a variety of natural, commercial, recreational, and industrial resources. *Id*. § 48-39-20 (2008). The General Assembly observed that ill-planned development threatened to destroy important ecological, cultural, and natural characteristics, as well as industrial and economic values. *Id.* § 48-39-20(E). Thus, the General Assembly acted with *competing demands* between the urgent need to protect natural systems in the coastal zone and balancing economic interests in mind. *See id.* § 48-39-20(F). In section 48-39-30, the General Assembly declared the state policy of protecting the quality of the coastal environment *and* promoting the economic improvement of the coastal zone. *Id.* § 48-39-30(A). In subsection (B), the General Assembly expressed its intent to promote the economic *and* social improvement of the citizens of this State and to encourage development of coastal resources. *Id.* at § 48-39-30(B). The General Assembly realized that such improvement should only be achieved with due consideration for the environment, and that measurable maximum dollar benefits should be subordinate to insuring the maximum benefit to the people. *Id.* at § 48-39-30(B),(D).

The ALC considered all of these competing policies and concluded:

These policy statements require a balancing of economic development benefits and environmental preservation. Even though the focus of the inquiry is on the effects of the project, neither the bulkhead/revetment nor the potential limited residential development will result in any significant harm to the public resources or marine or other plant or animal life, nor significantly impair public access to critical areas . . . . The potential residential development is not ill-planned and will be implemented in a low density, environmentally sensitive manner. It will be subject to local, state, and possibly federal permitting requirements. Neither the proposed bulkhead/revetment nor the potential limited residential development transgresses the policies set forth in these two statutes.

Further, the ALC engaged in an extensive analysis regarding the erosion issues facing the Spit and the consequences this erosion would have on Kiawah's ability to prevent the loss of further upland, and determined:

> Moreover, evidence did not establish that there was a feasible alternative to the bulkhead/revetment that would stabilize the river shoreline and prevent the continued erosion of [Kiawah]'s upland . . . . That evidence clearly establishes a need for erosion control along the disputed shoreline.[13]

The majority fails to acknowledge the ALC's thorough findings of fact supporting its conclusions regarding sections 48-39-20 and 48-39-30. Instead—resting its conclusion on the public trust doctrine—the majority criticizes the ALC's finding that the proposed structure satisfies section 48-39-30(D)'s requirement of "maximum benefit to the people" because "the ALC failed to identify any benefit flowing to the public at large."

In assigning error to the ALC's findings on this issue, the majority discounts the General Assembly's intent to *balance* economic interests with the protection of the coastal zone's natural systems. In my opinion, the term "people," as used in the statute, should be read to include members of the general public wishing to make proper use of our coastal resources, *and* those members of the public with an ownership interest located in or around the coastal zone.

---

[13] The ALC also examined the testimony regarding possible adverse effects on marine resources and wildlife, and made a detailed analysis of the facts presented regarding wintering piping plovers, a threatened species under the Endangered Species Act, and diamond-back terrapins. The ALC observed that there had never been a single sighting of a piping plover in the proposed structure's construction area. The ALC also observed that the United States Fish and Wildlife Service propounded a final determination of the critical habitat for piping plovers, and this determination specified the critical area of piping plover habitat as extending one mile north of Captain Sam's inlet, but not extending above the building setback line on the Spit. The ALC cited this fact in rejecting DHEC's contention that future residential development, apart from the proposed structure itself, would have an adverse effect on the piping plover.

The CZMA does not contemplate the loss of status as a member of the public simply because an individual happens to own property in a protected area. Moreover, the CZMA does not anticipate a thumb on the scale in DHEC's favor simply because of the opposing party's property interest. Alternatively, the CZMA's statutory scheme clearly contemplates permitting a landowner within the coastal zone to complete a construction project that preserves the owner's property rights while causing minimal disruption to the surrounding coastal area.

Therefore, I would hold that the ALC did not err in concluding that the proposed structure does not contravene the CZMA.

## B. The CZMP

I would also hold that the ALC did not err in concluding that the proposed structure does not contravene the CZMP. DHEC developed the CZMP for the coastal zone, as required by the CZMA. *See* S.C. Code § 48-39-80 (2008). All state and federal permits must be reviewed for compliance with the CZMP. *Spectre L.L.C.*, 386 S.C. 357, 360, 688 S.E.2d 844, 845 (2010). The CZMP classifies barrier islands as areas of special significance and dune areas, which fall landward of the beach zones, as areas of "special resource significance." Thus, project proposals for barrier islands "must demonstrate reasonable precautions to prevent or limit any direct negative impacts on adjacent critical areas." CZMP Chapter III (C)(3)(XII)(A)(2). Additionally, project proposals for sand dune areas in close proximity to those dunes in critical areas must also comply with these same direct precautions. *Id.* Chapter III (B). The CZMP also sets forth a policy of increasing the amount of public space in the coastal zone, and protecting those areas in the coastal zone which are inhabited by endangered or threatened species. *Id.*

The ALC concluded that the proposed structure did not contravene the CZMP:

> The development techniques and safeguards [Kiawah] intends to implement are consonant with the policies in the CZMP. More specifically, I find the low density development . . . that would be employed in the residential development of [the Spit] entail [sic] reasonable precautions. *No evidence was offered to alter this important point.* The many rows of dunes seaward of the setback line would remain essentially intact on a permanent basis to enjoy for their

beauty and protection, thereby preserving the strong natural protections deemed desirable by the policies in the CZMP.

. . . .

The potential residential development on private property will also not impair public open space at Beachwalker Park or along the beach. Finally, the developable area of Captain Sam's peninsula is well outside . . . boundaries of designated critical habitat . . . . It is thus not a Geographic Area of Particular Concern (GAPC) under the CZMP.

(Emphasis added).

In my opinion, the ALC's findings on this issue are well supported. The Record contains evidence of the "environmentally-friendly" nature of the proposed residential development. Kiawah placed before ALC evidence of the proposed structure's effect on public access, and the lack of adverse impact on critical habitats. I would find that this evidence constituted substantial evidence supporting the ALC's conclusions regarding the proposed structure's compliance with the CZMP. *See S.C. Coastal Conservation League v. S.C. Dep't. of Health & Envtl. Control*, 363 S.C. 67, 77, 610 S.E.2d 482, 487 (2005) ("The record contains conflicting evidence concerning the direct and cumulative effects of building the bridge to Park Island. The evidence that the effects will be minimal constitutes substantial evidence supporting the finding that the permit complies with the Effects Regulation.").

## II.     *Regulation 30-11*

Like the majority, I would hold the ALC erred in concluding that DHEC may not take into account the proposed structure's impact on upland areas within the larger coastal zone. However, I would not find that the ALC committed an error of law in failing to give deference to DHEC's interpretation of regulation 30-11.

### a. Deference

The General Assembly placed significant authority in the boards and directors of administrative agencies, a decision which evinces the legislature's intent that courts defer to administrative agency decisions when appropriate. However, the General Assembly also created the ALC to provide a dispassionate

forum for the public to challenge administrative agency decisions. Moreover, the judicial branch retains the ultimate authority in deciding when agency decisions comport with established law. Thus, judicial review of administrative decisions requires a balancing between an agency's specialization and authority, and the checks and balances deeply rooted in our democratic government.

Article I, Section 22 of the South Carolina Constitution provides:

No person shall be finally bound by a judicial or quasi-judicial decision of an administrative agency affecting private rights except on due notice and an opportunity to be heard; nor shall he be subject to the same person for both prosecution and adjudication; nor shall he be deprived of liberty or property unless by a mode of procedure prescribed by the General Assembly, and he shall have in all such instances the right to judicial review.

S.C. Const. Art. 1, § 22.

The General Assembly codified these constitutional concerns through the enactment of the APA. James B. Richardson, *Judicial Review of Agency Decisions*, in South Carolina Administrative Practice and Procedure 459 (Randolph R. Lowell ed. 2008) [hereinafter Practice and Procedure]. Additionally, the General Assembly placed the ALC in a central role providing a "neutral forum for fair, prompt, and objective administrative hearings" for members of the public affected by the actions of governmental agencies. Randolph R. Lowell, *The Contested Case Before the ALC*, Practice and Procedure 148. Prior to the ALC's creation, citizens seeking an evidentiary hearing challenging a state agency's action appeared before that regulatory agency's *own* hearing officers. *Id.* One of the central motivations supporting the ALC's formation was to improve the consistency and objectivity of the administrative adjudicatory process. *Id.* The General Assembly created the ALC in 1993, as part of Act No. 181 of that year, commonly known as the "Restructuring Act." *Id.* As part of the Restructuring Act, the legislature replaced many board and commissions with cabinet style agency directors. *Id.* The resulting regime empowered these directors to administer the regulatory function of the agencies. *Id.* Concomitantly, the General Assembly established the ALC, creating the functional separation contemplated by Article 1, Section 22, and the general separation of powers principle. *Id.* (explaining that central panels of ALC's "provide a more efficient and professional forum for the resolution of administrative disputes").

The instant case concerns a "contested case," one of several classes of proceedings the ALC is authorized to conduct. The APA defines a contested case proceeding, in pertinent part, as

> a proceeding including, but not restricted to, ratemaking, price fixing, and licensing, in which the legal rights, duties, or privileges of a party are required by law or by Article I, Section 22, Constitution of the State of South Carolina, 1895, to be determined by an agency or the Administrative Law Court after an opportunity for hearing.

S.C. Code Ann. § 1-23-505(A). The General Assembly specifically granted ALCs the significant right to render final decisions based on de novo review. Lowell, Practice and Procedure 152 ("In contrast to [ALCs] in other states and within the Federal system, South Carolina's [ALC's] *render final agency decisions*, subject only to judicial review." (Emphasis added)). The ALC's de novo review hearing is best explained as

> one in which the decisionmaker does not review the decision of someone else, but *makes the determination himself.* Thus, the [ALC], while he may use the record compiled earlier as part of the evidence in the case, may receive additional evidence and decides the issue *without regard* to the decisions made by the agency.

*Id.* (emphasis added); *see Blizzard v. Miller*, 306 S.C. 373, 375, 412 S.E.2d 406, 407 (1991) ("A trial de novo is one in which 'the whole case is tried as if no trial whatsoever had been had in the first instance.'"). *See State v. Whitner*, 399 S.C. 547, 552, 732 S.E.2d 861, 864 (2012) (explaining that questions decided under de novo review may be decided without any deference to the court below); *Lexington Cnty. Sch. Dist. One Bd. of Trs. v. Bost*, 282 S.C. 32, 34, 316 S.E.2d 677, 678 (1984) (explaining that de novo review of an agency decision record may be entered into evidence but accorded no deference); *see also William F. Funk and Richard H. Seamon*, Administrative Law: Examples and Explanations at 71 n.1 (2001)) ("Thus the de novo hearing at the ALC closely resembles a civil bench trial in terms of procedure, evidentiary rules and standards, protocol, and finality of decision.").

Consequently, I disagree with the majority's conclusion that the ALC committed an error of law in failing to give deference to DHEC's interpretation of

applicable statutes and regulations. I would find that in a contested case, the ALC is under no obligation to defer to an agency interpretation, but instead, provides the final agency determination based on the ALC's view of the record.[14] The ALC's final decision is of course subject to judicial review, and in that context, courts sitting in an appellate capacity must review the ALC's decision under the standard provided by section 1-23-610. In my opinion, this perspective of agency review comports perfectly with the APA's substantial evidence requirements contained in section 1-23-610, the de novo paradigm of the contested case hearing, and the constitutional safeguards contained in Article 1, Section 22 of the South Carolina Constitution. A contrary position places a contesting party at a significant disadvantage when contesting an agency decision. There is simply no support for the notion that the General Assembly intended such a result, or to constrain the ALC's ability to conduct a thorough de novo analysis.[15]

Nevertheless, I do not contend the reviewing court should ascribe nominal value to an agency's statutory and regulatory interpretations, or that the agency's interpretations are without merit—outside the ALC's final determinations. Instead, as this Court's precedent provides, an agency's well-established and consistent interpretation of statutes and regulations that the agency is charged with administering are entitled to deference. Richard Seamon, *Administrative Agencies: General Concepts and Principles*, Practice and Procedure 17 (Randolph R. Lowell ed. 2004). This principle recognizes the General Assembly's decision to make the agency initially responsible for enforcing certain statutes and regulations and acknowledges the agency's expertise and experience in this regard. *Id.*

However, within the administrative scheme, judicial deference to an administrative interpretation is not the functional equivalent of section 1-23-610's

---

[14] *See, e.g.*, S.C. Code Ann. § 1-23-380 ("A party who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision in a contested case is entitled to judicial review . . . . ").

[15] Of course, section 1-23-380 of the South Carolina Code provides administrative agencies the right to appeal, despite the fact that the ALC's decision is viewed as the final agency decision. *See* S.C. Code Ann. § 1-23-380 (Supp. 2012) ("A *party* who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision in a contested case is entitled to judicial review pursuant to this article and Article 1." (emphasis added)).

restrictive standard of review.  This Court's willingness to defer to a long-standing agency interpretation should not translate into review of an agency's interpretation or action under a special abuse of discretion standard tailored to the administrative agency's own view of its decision.  Instead, in my opinion, judicial deference is best articulated as the attachment of "great weight" to an agency's understanding of its own responsibilities, and applying that understanding absent a convincing or persuasive reason for the reviewing court to diverge.  *See Stone Mgf. Co. v. S.C. Emp't Sec. Comm'n*, 219 S.C. 239, 249, 64 S.E.2d 644, 648 (1951) (explaining that administrative practice is a "weight on the scale," but not conclusive, and that final responsibility for the interpretation of the law rests with the courts).

According to the majority, South Carolina's "deference doctrine provides that courts defer to an administrative agency's interpretations with respect to the statutes entrusted to its administration or its own regulations 'unless there is a compelling reason to differ.'" (Citation omitted).  In my opinion, the terms "defer" and "compelling" should not be used to disrupt the critical balance between the courts' role in interpreting the law and the administrative agencies' duty to execute the law.  This balance is not reflected in a standard which implies that bureaucratic interpretations serve as a snare to judicial and administrative courts in their ability to review agency decisions using all constitutionally and statutorily conferred powers.

Thus, I would find that in a contested case hearing the ALC is not compelled to defer to an agency interpretation regarding applicable laws or regulations.  As a result, I do not base my conclusion on principles of deference, and I find the majority's deference analysis unnecessary.

**b.  ALC's Interpretation of Regulation 30-11**

I would hold that the ALC misconstrued regulation 30-11 of the South Carolina Code of Regulations, and erroneously concluded that DHEC lacked authority to consider impacts "outside critical areas when reviewing applications to alter or utilize critical areas."

Regulation 30-11 provides general guidelines for all critical areas.  The regulation contains DHEC's rules and regulations for permit applications in "an effort to reduce the irreversible loss of productive tidelands, coastal waters, beaches, and dunes while meeting long-range State development needs."  S.C.

Code Ann. Regs. 30-11(A)(1999). Subsection (C) of Regulation 30-11's provides, in pertinent part:

> In the fulfilling of its responsibility under Section 48-39-150, the Department must in part base its decisions regarding permit applications on the policies specified in Sections 48-39-20 and 48-39-30, and thus, be guided by the following:
>
> > (1) The extent to which long range cumulative effects of the project may result within the context of other possible development and the general character of the area.

*Id.* Regs. 30-11(C)(1).

Appellants argue that the "area" referred to under this regulation extends beyond the critical area to adjacent upland. Appellants' argument necessarily means that sections 48-39-20 and 48-39-30 permit DHEC, when considering a critical area permit, to consider a proposed structure's impact on anything surrounding the critical area, as long as the area is within the coastal zone. According to Appellants, these statutes indicate the "General Assembly's intent that [DHEC], when acting on critical area permit applications, would not just protect and restore or enhance the critical areas, but rather that the Department would protect . . . all of the resources within the coastal zone."

The ALC viewed DHEC's authority more narrowly:

> [T]he area for which [DHEC] has regulatory authority is the critical area, not the high ground outside the critical area. Construing this provision otherwise would lead to a substantial expansion of [DHEC's] authority to regulate the development of entire communities. Conceivably, [DHEC] could deny critical area permits near towns or cities simply because it believes the permits would facilitate upland sprawl and general over-development . . . . [DHEC] avers that it has the authority through coastal permitting to deny upland development even against the Town's approval of that development through its zoning process. If the General Assembly had intended to authorize such a considerable expansion of [DHEC's]

authority it is inconceivable that it would have done so with such general language.

In my opinion, both the ALC's and Appellants' views of Regulation 30-11 present competing, and equally defensible views of the force of Regulation 30-11. Section 48-39-20 plainly sets forth the General Assembly's findings regarding the importance of the coastal zone. The General Assembly acknowledged the coastal zone's "rich" variety of "natural, commercial, recreational, and industrial resources" of both immediate and potential value to South Carolina's present and future well-being. S.C. Code Ann. § 48-39-20(A). The General Assembly observed the adverse impacts caused by the increasing and competing demands on the coastal zone

> occasioned by population growth and economic development, including requirements for industry, commerce, residential development, recreation, extraction of mineral resources and fossil fuels, transportation and navigation, waste disposal and harvesting of fish, shellfish and other living marine resources have resulted in the decline or loss of living marine resources, wildlife, nutrient-rich areas, permanent and adverse changes to ecological systems, decreasing open space for public use and shoreline erosion.

*Id.* § 48-39-20(B).

The General Assembly then noted the encroachment of federal regulation into land use and permit controls in the coastal zone, and made an affirmative statement that state and local governments must exercise their full authority over lands and waters in the coastal zone. *Id.* § 48-39-20(C). The statute then provides that ill-planned development threatens to destroy important scenic, natural, geological, industrial, and economic values in the coastal zone, as well as ecologically fragile marine resources and wildlife. *Id.* § 48-39-20(D), (E) (specifically citing "man's alterations" as a source of destruction). Finally, section 48-39-20 labels the environmental protection regime in place at the time of the provision's adoption as insufficient, stating:

> In light of competing demands and the urgent need to protect and to give high priority to natural systems in the coastal zone while balancing economic interests, present state and local institutional

arrangements for planning and regulating land and water uses in such areas are inadequate.

*Id.* § 48-39-20 (E). Unlike the overarching findings stated in section 48-39-20, section 48-39-30 provides specific state policies "to be followed in the implementation" of the CZMA. The statute provides for policies promoting economic and social improvement, encouraging and developing coastal resources that protect sensitive and fragile areas from inappropriate development, and providing adequate environmental safeguards. *Id.* § 48-39-30(A),(B)(1). Additionally, section 48-39-30 provides that a primary goal of the CZMA is to protect the coastal zone, specifically tidelands and sand dunes, and to prevent beach erosion. *Id.* § 48-39-30(B)(2)–(4). However, subsection (C) relays the balance to be struck between protecting and preserving coastal resources, in that "no government agency shall adopt a rule or regulation or issue any order that is unduly restrictive so as to constitute a taking of property without the payment of just compensation in violation of the Constitution of this State or of the United States." *Id.* § 48-39-30(C). Of course, as discussed *supra*, subsection (D) of section 48-39-30 allows for combination of uses in critical areas insuring maximum benefit to the people, but not necessarily yielding measurable maximum dollar benefits. *Id.* § 48-39-30 (D).

Based on these policies, DHEC argues that in reviewing critical area construction permits pursuant to Regulation 30-11(C), consideration of impacts outside the critical area is appropriate. In my opinion—and as the majority also concludes—this position is logical. After all, DHEC cannot be expected to protect the coastal zone as instructed by the General Assembly if it cannot decipher how projects within the critical area might affect the coastal zone. One can envision a scenario in which a proposed structure would have minimal, or at least acceptable, adverse impacts on the critical area, and at the same time cause adverse impacts to areas outside the critical area, but within the coastal zone.

Nevertheless, in my opinion, the ALC raises a salient point regarding the reach of DHEC's permitting authority. There is no indication within sections 48-39-20 or -30 that the General Assembly intended DHEC's permitting authority within the coastal zone to run roughshod over individual property interests and, disturbingly, the authority of local governments to carry out their constitutionally protected duties. To the contrary, section 48-39-20 speaks to state *and* local governments exercising their full authority over the lands and waters of the coastal

zone.  S.C. Code Ann. § 48-39-20(C).  Moreover, that section refers to state and local institutions operating under "arrangements," not a regime in which state regulations eviscerate local authority.  Significantly, section 48-39-30 provides for promotion of "economic and social improvement" and specifically addresses the role of entities outside DHEC in preserving the coastal zone:

> To encourage and assist state agencies, counties, municipalities and regional agencies to exercise their responsibilities and powers in the coastal zone through the development and implementation of comprehensive programs to achieve wise use of coastal resources giving full consideration to ecological, cultural and historic values as well as to the needs for economic and social development and resources conservation.

*Id.* § 48-39-30 (B)(5).  Thus, section 48-39-30 calls for a balance between competing interests and regulatory concerns within the coastal zone, which in turn directly contradicts DHEC's assertion of superior regulatory power throughout this broad geographic area.

I find two prior decisions reviewing DHEC permitting actions instructive.  In *Spectre*, DHEC denied Spectre's storm-water/land disturbance permit because the Department found it inconsistent with various provisions of the CZMP.  *Spectre L.L.C.*, 386 at 364–65, 688 S.E.2d at 847–48.  Spectre appealed and in reversing DHEC, the ALC held that the CZMP did not apply to the property in question.  *Id.* at 362, 688 S.E.2d at 846.  This Court reversed, finding that the language of the CZMP set forth broad jurisdiction over the coastal zone, thereby supporting DHEC's interpretation of the CZMP regarding the Spectre site.  *Id.* at 369, 688 S.E.2d at 850.

Spectre sought to fill isolated freshwater wetlands for commercial development.  The CZMP specifically prohibited this activity, and most commercial construction requiring fill of freshwater wetlands.  Moreover, unlike the present case, any adverse effects arose from the immediate impact of the proposed fill, and not later development which might have occurred if the fill permit had been granted.  In the instant case, as the ALC observed, DHEC did not deny the proposed structure permit based on immediate adverse impacts on the critical area, but instead upon an assumption that the revetment would lead to residential development of the upland portion of the Spit.  While *Spectre* made it clear that the CZMP had the full force of law, the case did not hold that the CZMP

authorizes DHEC to deny critical area permits because of the effects of later development of the upland area simply because of the upland's location within the coastal zone.

In *Spectre*, this Court noted DHEC's indirect authority and then pointed to a provision of the CZMP which *explicitly sanctioned*, and served to legitimize, DHEC's denial of the permit. No such language exists here. Thus, in my view, it is reasonable to conclude that if the General Assembly intended to grant DHEC the power to deny critical area permits based on possible upland construction, or permitting authority superior to that of almost all local zoning laws within the coastal zone, specific and enabling language would have been provided. Simply put, DHEC's explicit statutory power would seem to narrow and confine the Department's indirect authority over the coastal zone.

In *Murphy v. South Carolina Department of Health and Environmental Control*, 396 S.C. 633, 723 S.E.2d 191 (2012), proposed renovations to Chapin High School required filling a portion of a stream on the property. *Id.* at 636, 723 S.E.2d at 193. DHEC issued a permit to District 5 of Lexington and Richland Counties authorizing the project. *Id.* at 636–38, 723 S.E.2d at 193–94. Regulation 61–101 of the South Carolina Code of Regulations requires DHEC to deny certification if the proposed activity permanently alters the aquatic ecosystem in the *vicinity* of the project, or if there is a "feasible alternative" with less adverse consequences. *Id.* at 637, 723 S.E.2d at 193 (citing S.C. Code Ann. Regs. 61–101.F.5(a) & (b) (Supp. 2011)). Kim Murphy, a nearby resident, claimed that in considering the vicinity of the project under regulation 61–101, DHEC's inquiry should have been limited to the actual 727 feet of stream DHEC planned to fill. *Id.* at 638, 723 S.E.2d at 194. The ALC rejected this claim, and affirmed the certification. *Id.* Murphy appealed. *Id.*

Although the regulation did not define the term *vicinity*, this Court "interprets an undefined term in accordance with its usual and customary meaning." *Id.*, 723 S.E.2d at 640. Thus, this Court concluded:

> Merriam–Webster defines vicinity as meaning "the quality or state of being near: proximity" . . . . Using this accepted meaning of the word vicinity, the regulation clearly includes more than just the project; it logically incorporates the surrounding area. Moreover, a reading to the contrary would render it impossible to ever obtain a certification

> to fill a portion of a stream as the functions and values of that area would always necessarily be eliminated.

*Id.* (citation omitted).

In enacting regulation 61–101, the General Assembly intended for DHEC to consider the impacts proposed construction might have on the surrounding area, and thus provided the term *vicinity* in the regulation.

In my opinion, these two cases stand for the proposition that when the General Assembly intends to provide DHEC with specific permitting authority, specific and enabling language is afforded. However, I cannot deny the import of sections 48-39-20 and 30 and would interpret DHEC's regulatory authority pursuant to Regulation 30-11(C) in harmony with those provisions and the overall policies set forth in the CZMA. *See, e.g.*, *Crisp v. SouthCo., Inc.*, 401 S.C. 627, 644, 738 S.E.2d 835, 843 (2013) ("This interpretation is in harmony with the entire purpose of our workers' compensation regime and recognizes the other avenues of compensation available under the scheme . . . ."); *Hodges v. Rainey*, 341 S.C. 79, 91, 533 S.E.2d 578, 585 (2000) (recognizing the goal of statutory construction is to harmonize conflict and avoid absurd results).

Construction of a regulation is a question of law to be determined by the courts, and regulations must be construed using the same canons of constructions as statutes. *See S.C. Dep't of Revenue v. Blue Moon of Newberry, Inc.*, 397 S.C. 256, 260, 725 S.E.2d 480, 483 (2012) (citations omitted). Thus, I would hold that the ALC erred in concluding that DHEC may not take into account the proposed structure's impact on the coastal zone.

The General Assembly clearly intended to halt construction which would destroy important ecological interests and other coastal resources, but there is no evidence that this policy should place property owners and local governments in a disadvantaged position. Thus, in my view, sections 48-39-20 and -30 do not authorize DHEC to restrict the rights of property owners or the power of local governments unless those entities act in ways that would *destroy* coastal resources, or *harm* those resources under otherwise preventable conditions. DHEC's review of permit applications must comport with the language contained in applicable statutes and regulations. DHEC's authority cannot be used to transform the Department into a broad-based governmental entity with unfettered authority over all citizens in the coastal zone. An administrative agency with this type of power

runs counter to the South Carolina Constitution, the clear text of the CZMA, and the APA's intent.

Despite the ALC's error, reversal is not warranted in my opinion. The ALC concluded that the potential residential development would "not have deleterious impacts even if the [c]ourt were to consider the effects of the potential residential development." According to the ALC:

> [T]he numerous measures and safeguards [Kiawah] intends to utilize in its development of Captain Sam's demonstrate that this limited residential use would be sensitively planned, responsive to the natural features of the peninsula, attentive to its flora and fauna, and without significant negative effects in the critical area . . . . [T]he [c]ourt concludes that there was no evidence adduced that the residential development would have any material adverse environmental effects on the upland.

The majority concludes that "*even the most* environmentally sensitive development will necessarily have some negative effects of the environment." (Emphasis added). In my opinion, this observation is not grounded in the CZMA's language. Moreover, in my view, this conclusion is far too broad to encompass the General Assembly's specific intent evident in the CZMA.

The ALC may choose between conflicting evidence, and that decision is no less supported by substantial evidence. *See Coastal*, 363 S.C. at 77, 610 S.E.2d at 487. "Substantial evidence" is not a mere scintilla of evidence nor the evidence viewed blindly from one side of the case, but is evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion that the administrative agency reached or must have reached in order to justify its action. *Lark v. Bi-Lo, Inc.*, 276 S.C. 130, 135, 276 S.E.2d 304, 306 (1981) (quoting *Law v. Richland Cnty. School Dist. No. 1*, 270 S.C. 492, 243 S.E.2d 192 (1978)).

In my view, reasonable minds could reach the same conclusion as the ALC—that even if DHEC considered possible upland effects under a proper construction of Regulation 30-11, DHEC should not have denied Kiawah's permit pursuant to the regulation. Thus, I would hold that the ALC's error regarding Regulation 30-11(C) does not require reversal, and that substantial evidence in the record supports the ALC's decision that the proposed structure complies with that regulation.

## III.    *Regulation 30-12(C)*

Further, I would hold that the ALC did not err in concluding that the proposed structure met the specific criteria for bulkheads and revetments set forth in regulation 30-12(C).

Pursuant to regulation 30-12(C), bulkheads and revetments are prohibited where they restrict public access unless upland is eroding due to tidally-induced erosion, or no feasible alternative to the installation of the structure exists. S.C. Code Ann. Regs. 30-12(C) (2008). In my opinion, substantial evidence supports the ALC's determination that the proposed structure did not adversely affect public access pursuant to the regulation. However, even if public access is affected, I would find that the demonstrated loss of upland[16] and lack of feasible alternatives to the proposed structure support the ALC's determination that the project plainly satisfies regulation 30-12.

In my opinion, there is substantial evidence that no environmentally-responsible feasible alternatives existed. For example, Kiawah's project engineer testified regarding alternative systems:

> We looked at . . . a number of alternatives investigated [sic], bulkhead, riprap, to geo-tubes, a number of things that could have been used, and it was our recommendation that they use the concrete mats . . . . [F]rom all the systems that we were aware of, it seemed like that is the softest most compatible system out there . . . . We've seen them used in other locations where they become completely naturalized. It's kind of in keeping with the whole essence of Kiawah where . . . we also need engineering solutions that blend with the environment we're creating.

In response, as the ALC also noted, the South Carolina Coastal Conservation League (CCL) urged that the "alternative" was to do nothing, because according to the CCL, only minor erosion may have occurred in the last 10-12 months. The ALC disagreed, finding that the testimony clearly established a trend of continuous and significant shoreline erosion along the riverbank for several decades. In my

---

[16] I agree with the majority's finding that substantial evidence exists to support the ALC's finding that upland is being lost due to tidally induced erosion.

opinion, that evidence clearly establishes a need for erosion control along the disputed shoreline.

## CONCLUSION

The ALC carefully considered the evidence contained in the six-volume, 2,380 page record in this case. The ALC provided factual findings regarding the proposed structure's potential effects on wildlife and public use, and the proposed structure's compliance with the controlling statutes. In my view, the ALC's decision to modify the final plan fits squarely within his discretion and de novo review.[17] *See Risher v. S.C. Dep't of Health and Envtl. Control*, 393 S.C. 198, 207–08, 712 S.E.2d 428, 433 (2011) (explaining that the ALC is the ultimate fact finder in a contested case, and is not restricted by the findings of the administrative agency); *Brown v. S.C. Dep't of Health and Envtl. Control*, 348 S.C. 507, 512, 560 S.E.2d 410, 413 (2002) (recognizing that the ALC sits de novo in a contested case proceeding). The General Assembly did not vest the ALC with broad authority to hear permit disputes, and conduct a trial, to only then have this Court restrain the ALC from issuing a decision which reflects the best outcome gleaned from that trial. *See B & A Dev., Inc. v. Georgetown Cnty.*, 372 S.C. 261, 268–69, 641 S.E.2d 888, 893 (2007) (recognizing the principle that when the legislature intends to confine expansive authority, it will expressly provide for such a limitation).

The net result of the majority decision is that a permit for construction of the proposed structure to extend 270 feet is approved, because the majority approach is to defer to the DHEC staff's decision. In my view, the majority's position gives

---

[17] As Kiawah and the Savannah River Maritime Association (SRMC) note, the General Assembly has broadly defined the authority of the ALC. The ALC has the same "power at chambers or in open hearing as do circuit court judges" and the authority to issue writs necessary to give effect to its jurisdiction. S.C. Code Ann. § 1-23-630 (2005) (granting circuit judges the power to grant, decline, or modify injunctions). The ALC presides over hearings of all contested cases and must issue a decision in a final written order. *Id.* § 1-23-505(3) (Supp. 2012). If the ALC's final order is not appealed in accordance with the provisions of section 1-23-610 of the South Carolina Code, the certified order has the same effect as a judgment of the court where filed and may be recorded, enforced, or satisfied in the same manner as a judgment of that court. *Id.* § 1-23-600(I) (Supp. 2012).

unbridled deference to executive branch agency personnel and thus contravenes the protection provided by Article I, § 22 of the South Carolina Constitution.  For this reason, and the reasons heretofore discussed, I would affirm the ALJ's decision, as modified by my analysis of Regulation 30-11 discussed *supra*.


**KITTREDGE, J., concurs.**