# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Gene B. Schwiers, Respondent,

v.

South Carolina Department of Health and Environmental Control and Stewart W. Heath, Respondents below,

Of whom South Carolina Department of Health and Environmental Control is the Respondent,

And

Stewart W. Heath is the Appellant.

Appellate Case No. 2016-002136

———————————

Appeal From The Administrative Law Court
Harold W. Funderburk, Jr., Administrative Law Judge

———————————

Opinion No. 5700
Heard May 6, 2019 – Filed December 31, 2019

———————————

**REVERSED**

———————————

Eugene LeRoy Nettles, III, of Nettles Turbeville & Reddeck, of Lake City, for Appellant.

Gene B. Schwiers, of Greenville, pro se.

Bradley David Churdar, of Charleston, for the South Carolina Department of Health and Environmental Control.

**MCDONALD, J.:** In this contested permitting matter, Stewart Heath appeals the Administrative Law Court's (ALC's) order denying his application to amend a critical area permit to modify his private dock. Heath argues the ALC committed errors of law in finding the proposed modifications failed to comply with the requirements of the Coastal Zone Management Act, specifically section 48-39-150 of the South Carolina Code (2008 & Supp. 2019), and critical area regulations 30-12(A)(1)(e) and (p) of the South Carolina Code of Regulations (2011). Heath further asserts the ALC erred in failing to consider the relevant site specific characteristics and disregarded regulation 30-11(A)(2)'s requirement that DHEC ensure consistent permit evaluations. We reverse.

**Facts and Procedural History**

In 2012, DHEC approved Heath's application for a permit to modify his existing private use dock on Main Creek in Garden City. In 2015, Heath applied to amend the permit to authorize him to shift his existing floating dock northward and add a second boatlift. After considering Heath's application and letters from neighboring property owners objecting to the proposed modifications, DHEC approved the amended permit. Gene Schwiers, the landowner of an adjacent parcel and dock, requested the South Carolina Board of Health and Environmental Control (the Board) conduct a final review of the permitting decision.[1]

After the Board declined to conduct a final review conference, Schwiers filed a request for a contested case hearing before the ALC. In her prehearing statement, Schwiers argued the proposed location of Heath's boatlift "would have a negative impact on [her] family's enjoyment of [their] property because it would be an impediment to [their] visual corridor." She noted other neighboring property owners were concerned DHEC's "continued approval of encroachment" could result "in the loss of value in the property owned by those impacted." In its prehearing statement, DHEC asked that the ALC affirm its issuance of the amended permit, explaining it determined Heath's requested modifications to the existing dock would cause no material harm to the policies of the Act[2] because the proposed modifications were consistent with other docks along the Main Creek

---

[1] Schwiers is a general partner of Sparkling Waters, LP, the legal owner of the property adjacent to Heath's property.

[2] *See* S.C. Code Ann. §§ 48-39-10 to -360 (2008 & Supp. 2019).

corridor and the resulting dock spacing would be consistent with the spacing of other docks in the vicinity.

During the hearing before the ALC, Schwiers testified the proposed boatlift would interfere with her complete enjoyment of her dock and her family's ability to navigate a twelve-foot kayak between Heath's dock and her own dock. She acknowledged some docks in the area had two boatlifts but asserted less than half of the docks along her street had two boat storage structures. In her opposition letter to DHEC, Schwiers complained the addition to Heath's dock would "encroach on [her] dock drastically," leaving "little to no room" between their docks, "and completely block her ability to fish, crab, catch minnows, and [participate in] all other water activities to the north side." She also stated her nephew would no longer be able to swim in the inlet or kayak on the north side of the dock and her elderly mother's activities from the north side of the pierhead would be restricted.[3]

Christopher Stout, Wetlands Section Project Manager for DHEC's Office of Ocean and Coastal Resource Management (OCRM), was project manager for DHEC's review of Heath's application to amend his critical area permit. According to Stout, Heath satisfied Regulation 30-12's project standards for adding the boatlift in that "Mr. Heath has an existing dock and what he has asked for fits within the purview of square footage and the actual number of boat storage structures that are allowed by the regulation." Stout testified that although Heath's existing dock was outside of his extended property lines—and thus did not comply with the general agency standard—it had been "grandfathered" because its construction predated the Act. There were "a significant number of grandfathered structures" on Main Creek, some of which did not adhere to the general standard concerning extended property lines. In evaluating Heath's application, Stout considered that at its closest point, Heath's proposed boatlift would be sixteen feet from Schwiers's fixed pierhead. Schwiers's stairs lead south, away from the Heath dock; thus, the boatlift addition would not impact her ability to access the water from the other sides of her dock. Stout also considered the characteristics of the area, noting portions of five docks belonging to other landowners crossed into Heath's own dock corridor, between his extended property lines. The ALC admitted an aerial image showing Heath's dock and the docks encroaching within his extended property lines.

---

[3] The ALC admitted opposition letters DHEC received from neighboring property owners as examples of documents DHEC reviewed in issuing the permit. Heath has not challenged the admission of these letters on appeal.

The ALC reversed DHEC's decision and denied Heath's amended permit application, finding the proposed location of the boatlift violated § 48-39-150(A)(10) and regulation 30-11(B)(10)[4] because the addition would result in material harm to the policies of the Act as referenced in regulation 30-12(A)(1)(p). In referencing the testimony presented at the hearing, the ALC noted, "Petitioner's objection concerning the inability to fish or crab, deals exclusively with preference of location on her pier, and the boatlift would not significantly hamper Petitioner's ability to engage in that activity." However, "the whole of the proposed construction [would] take place on Petitioner's side of the joint extended property line, thereby causing material harm to the policies of the Act as referenced in S.C. Code Ann. [§] 48-39-150(A)(10); 2 S.C. Code Ann. Regs. 30-11(B)(10) and 30-12(A)(1)(p)."

Heath moved to reconsider, challenging the ALC's emphasis on Schwiers's extended property lines as error due to the site specific characteristics of this section of Main Creek. Heath further questioned the order's finding as to the proposed boatlift's impact on Schwiers's value and enjoyment of her property, arguing Schwiers presented no evidence "that the dock modification would negatively affect the *value* of [Schwiers's] property."

The ALC denied Heath's motion to reconsider but issued an amended final order. The ALC again concluded the proposed location of the boatlift violated § 48-39-150(A)(10) and regulation 30-11(B)(10) because "the proposed boatlift will affect the value and enjoyment of adjacent owners to the extent of producing material harm to the policies of the Act." The ALC found, "The ability to swim, kayak, and fish from Petitioner's dock is sufficiently impeded by the close proximity of the proposed second boatlift to constitute material harm to the policies of the Act."

**Standard of Review**

In an appeal from the ALC, the Administrative Procedures Act provides our standard of review. *See Kiawah Dev. Partners, II v. S.C. Dep't of Health & Envtl. Control*, 411 S.C. 16, 28, 766 S.E.2d 707, 715 (2014) (citing S.C. Code Ann. § 1-23-610(B) (Supp. 2019)). Appellate courts must confine their analysis to whether the ALC's decision is:

---

[4] S.C. Code Ann. Regs. 30-11(B)(10) (2011). The considerations of Regulation 30-11(B) mirror those of § 48-39-150(A).

(a) in violation of constitutional or statutory provisions;

(b) in excess of the statutory authority of the agency;

(c) made upon unlawful procedure;

(d) affected by other error of law;

(e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(f) arbitrary or capricious or characterized by an abuse of discretion or clearly unwarranted exercise of discretion.

*Id.*

"Thus, this court can reverse the ALC if the findings are affected by error or law, are not supported by substantial evidence, or are characterized by abuse of discretion or clearly unwarranted exercise of discretion." *Olson v. S.C. Dep't of Health & Envtl. Control*, 379 S.C. 57, 64, 663 S.E.2d 497, 501 (Ct. App. 2008).

In determining whether the decision of the ALC was supported by substantial evidence, a reviewing court "need only find, looking at the entire record on appeal, evidence from which reasonable minds could reach the same conclusion as the ALC." *Kiawah Dev. Partners II*, 411 S.C. at 28, 766 S.E.2d at 715. "However, the court may reverse the ALC decision where it is in violation of a statutory provision of it is affected by an error of law." *Id.*

**Law and Analysis**

**I. Section 48-39-150(A) and Material Harm to the Policies of the Act**

The General Assembly passed the Coastal Zone Management Act in 1977. *See* §§ 48-39-10 to -360. Section 48-39-20 of the Act sets forth the following relevant legislative findings:

(A) The coastal zone is rich in a variety of natural, commercial, recreational and industrial resources of immediate and potential value to the present and future well-being of the State.

(B) The increasing and competing demands upon the lands and waters of our coastal zone . . . have resulted in the decline or loss of living marine resources, wildlife, nutrient-rich areas, permanent and adverse changes to ecological systems, decreasing open space for public use and shoreline erosion.

. . . .

(D) The coastal zone . . . may be ecologically fragile and consequently extremely vulnerable to destruction by man's alterations.

(E) Important ecological, cultural, natural, geological and scenic characteristics, industrial, economic and historical values in the coastal zone are being irretrievably damaged or lost by ill-planned development that threatens to destroy these values.

According to § 48-39-30(A), "[T]he basic state policy . . . [of the Act] is to protect the quality of the coastal environment and to promote the economic and social improvement of the coastal zone and of all the people of the State."  The Act sets forth the following relevant state policies:

(1) To promote economic and social improvement of the citizens of this State and to encourage development of coastal resources in order to achieve such improvement with due consideration for the environment . . . ;

(2) To protect and, where possible, to restore or enhance the resources of the State's coastal zone for this and succeeding generations;

. . . .

(5) To encourage and assist state agencies . . . . to achieve wise use of coastal resources giving full consideration to ecological, cultural and historic values as well as to the

needs for economic and social development and resources conservation.

§ 48-39-30(B).

The Act provides that in determining whether to approve or deny a permit application, DHEC

> shall base its determination on the individual merits of each application, the policies specified in Sections 48-39-20 and 48-39-30 and be guided by the following general considerations:
>
> (1) The extent to which the activity requires a waterfront location or is economically enhanced by its proximity to the water.
>
> (2) The extent to which the activity would harmfully obstruct the natural flow of navigable water. . . .
>
> (3) The extent to which the applicant's completed project would affect the production of fish, shrimp, oysters, crabs or clams or any marine life or wildlife or other natural resources in a particular area including but not limited to water and oxygen supply.
>
> (4) The extent to which the activity could cause erosion, shoaling of channels or creation of stagnant water.
>
> (5) The extent to which the development could affect existing public access to tidal and submerged lands, navigable waters and beaches or other recreational coastal resources.
>
> (6) The extent to which the development could affect the habitats for rare and endangered species of wildlife or irreplaceable historic and archeological sites of South Carolina's coastal zone.

(7) The extent of the economic benefits as compared with the benefits from preservation of an area in its unaltered state.

(8) The extent of any adverse environmental impact which cannot be avoided by reasonable safeguards.

(9) The extent to which all feasible safeguards are taken to avoid adverse environmental impact resulting from a project.

(10) The extent to which the proposed use could affect the value and enjoyment of adjacent owners.

§ 48-39-150(A). The Act further requires that "[a]fter considering the views of interested agencies, local governments and persons, and after evaluation of biological and economic considerations, if the department finds that the application is not contrary to the policies specified in this chapter, it shall issue to the applicant a permit." § 48-39-150(B).

Heath argues the ALC erred in basing its decision solely on § 48-39-150(A)(10)'s "value and enjoyment" factor while ignoring the nine other statutory considerations DHEC must examine when determining whether to approve or deny a critical area permit. He contends the proposed boatlift would only affect Schwiers's ability to swim, kayak, and fish from the northern side of her dock—she would still be able to pursue these activities from the other sides of her dock. Heath asserts any such limitations were recreational only and did not affect the value of Schwiers's property, deep water access from her dock, or her ability to use or access her property.[5] Finally, Heath contends the ALC erred in finding the potential impact upon recreational activities in a private dock dispute rose to the level of causing "material harm to the policies of the Act." We agree.

Although our appellate courts have considered contested dock permits in a number of cases, few have addressed an ALC's finding that the location of a private dock constitutes a material harm to the policies of the Coastal Zone Management Act.

---

[5] Schwiers presented no evidence of impact the second boatlift might have on the value her property. Although very little of Schwiers's testimony was included in the record, her opposition letter was admitted during the hearing. The opposition letter does not address property value.

In *White v. South Carolina Department of Health & Environmental Control*, this court reviewed an ALC order requiring the Coffin Point Homeowners Association to rebuild its community dock in accordance with its permit as originally issued. 392 S.C. 247, 257–58, 708 S.E.2d 812, 817–18 (Ct. App. 2011), *overruled by on other grounds by Wells Fargo Bank, N.A. v. Fallon Properties S.C., LLC*, 422 S.C. 211, 810 S.E.2d 856 (2018). Although the drawing attached within Coffin Point's original application showed its proposed dock would be twenty feet from White's extended property line, the dock as constructed crossed over the extended property line, causing substantial disruption to White's commercial dock, where he sold fuel and ice to shrimpers. *Id.* at 251, 708 S.E.2d at 814. White testified his business earnings had steadily declined since the installation of the community dock; additionally, two of his customers testified about the adverse impact of the dock's location, explaining the distance between the docks combined with the size of their shrimp boats presented a danger of their boats colliding with the community dock. *Id.* at 257, 708 S.E.2d at 817–18. Thus, the ALC concluded the location of the dock constituted a material harm to the policies of the Act with respect to both the public's ability to navigate the creek and White's ability to conduct his business. *Id.*

In analyzing Coffin Point's challenge to the ALC's decision, the court was careful to differentiate between private navigational disputes and the disruption of a commercial enterprise and its customers, explaining:

> Coffin Point cites the case of *Dorman v. South Carolina Department of Health and Environmental Control* in support of its argument that policing disputes between neighboring dock owners is not within the policies of the Act. 350 S.C. 159, 171, 565 S.E.2d 119 (Ct. App. 2002). *Dorman* involved objections to a proposed boat dock from neighbors on both sides of the applicant's property. 350 S.C. at 162-63, 565 S.E.2d at 121. The neighboring property owners objected on the grounds that the proposed dock would crowd too close to their existing docks and the roof would impinge their view. 350 S.C. at 163, 565 S.E.2d at 121. This court adopted OCRM's interpretation of Regulation 30-12, which included the position that any navigational issue between private docks is a private property issue. *Id*. at 171, 565 S.E.2d at 126. Specifically, the Appellate Panel of OCRM stated "It is not the policy of OCRM to police

navigational disputes that should be dealt with among adjacent property owners." *Id*. at 163, 565 S.E.2d at 121 (internal quotation marks omitted). This court remanded the case to the ALJ to determine whether the permit should be granted in light of OCRM's interpretation of Regulation 30-12. *Id*. at 171-72, 565 S.E.2d at 126.

In contrast, the present case involves the disruption of a commercial enterprise and its customers. The objection lodged by White does not involve merely a private dispute with Coffin Point, but also concerns the needs of White's customers, who themselves are members of the public, and the local shrimping industry in general. Unlike *Dorman,* this case does not involve a mere private navigational dispute. Therefore, the ALJ's conclusion that the location of Coffin Point's dock presents a significant navigational hazard does not conflict with OCRM'S policy of avoiding the regulation of private navigational disputes.

*Id.* at 256, 708 S.E.2d 812, 816–17.

In affirming the ALC's finding that the location of the Coffin Creek dock "constitute[d] material harm to the policies of the Act," the *White* court recognized § 48-39-150(A) requires DHEC "to base its evaluation on [a permit application's] individual merits." *Id.* at 257, 708 S.E.2d at 17. The court emphasized the unique circumstances of the case, noting a DHEC official's admission that "staff would consider any 'significant impact' on a neighboring dock to constitute material harm to the policies of the Act." *Id.* at 257–58, 708 S.E.2d 817–18; *see also Maull v. S.C. Dep't of Health & Envtl. Control*, 411 S.C. 349, 361, 768 S.E.2d 402, 409 (Ct. App. 2015) (distinguishing *White* from a permitting case involving two private docks because *White* involved a commercial enterprise and serious navigational safety concerns of the public).

Here, Schwiers has not demonstrated the "significant impact" described in *White*, and the record lacks the substantial evidence necessary to support the ALC's denial of the permit under § 48-39-150(10) alone. The ALC's amended order correctly cites *Olson*, 379 S.C. at 57, 663 S.E.2d at 497, as an example of a case in which impact on an adjacent owner's "value and enjoyment" supported the denial of a dock permit. However, in *Olson*, in addition to their testimony that the proposed

dock would affect their recreational pursuits, both opposing property owners testified the proposed dock would lower their property values because of its close proximity to their existing docks. 379 S.C. at 67, 663 S.E.2d at 503; *see also White*, 392 S.C. at 257, 708 S.E.2d at 817–18 (in which the commercial dock owner testified his business earnings had steadily declined since the construction of the community dock). Moreover, the Olsons sought to construct a dock on non-waterfront property between two existing docks; the resulting space between the new and existing docks would have been seven and forty-four feet, respectively. *Olson*, 379 S.C. at 67, 663 S.E.2d at 503.

The ALC found DHEC's denial of the *Olson* permit was warranted based on both the impact of the dock on the adjacent owners' value and enjoyment and "the extent to which long-range, cumulative effects of the project may result with the context of other possible development and the general character of the area." *Id.* at 62, 663 S.E.2d at 500. This court affirmed, as substantial evidence supported both findings. *Id.* at 66–68, 663 S.E.2d at 502–03. But the *Olson* considerations differed from those of this case because an alleged impact to value and enjoyment was not the *sole* basis for denial of the permit, and there is no indication that the site-specific characteristics of the non-waterfront Romain Retreat property at issue were similar to those here.

Schwiers conceded during oral argument that she presented no evidence to the ALC that the proposed boatlift would decrease the value of her property. The evidence in the record established the boatlift addition would not affect deep water access from Schwiers's dock nor her family's ability to access the property. Rather, the only testimony Schwiers presented during the ALC hearing was that the proposed location of the boatlift could interfere with her complete recreational enjoyment of the north side of her dock. In her opposition letter, Schwiers claimed the proposed boatlift would encroach on her dock by leaving little to no room between her dock and Heath's and would completely block her ability to fish, crab, and catch minnows from the north side of her dock. Neither the letter nor Schwiers's testimony addressed the value of Schwiers's property. Accordingly, we find the record lacks substantial evidence to support the ALC's finding that the proposed boatlift would significantly impact Schwiers's "value and enjoyment" under § 48-39-150(A)(10) to the extent it would rise to the level of a "material harm to the policies of the Act."

In addressing the nine other factors of § 48-39-150(A), the ALC found the boatlift addition would not harmfully obstruct the natural flow of navigable water; affect production of wildlife, habitats of endangered species or historic sites along the

coastal zone; cause erosion or creation of stagnant water; or affect existing public access to tidal and submerged lands, navigable waters and beaches, or other recreational coastal resources. Such considerations fall clearly within the policies of the Coastal Zone Management Act as set forth in the legislative declaration of findings set forth in § 48-39-20 and the legislative declaration of policy detailed in § 48-39-30. Because we find the substantial evidence does not support the ALC's conclusion that the addition of the proposed boatlift to the already existing dock would result in material harm to the policies of the Act, we reverse the ALC's denial of the permit under § 48-39-150(A).

## II. Violation of Regulation 30-12(A)(1)(p)

Heath next asserts the ALC erred by finding the proposed boatlift's construction over extended property lines constituted a material harm to the policies of the Act in violation of regulation 30-12(A)(1)(p). He further contends the ALC failed to consider the individual merits of his application, specifically the need for an alternative dock alignment given the characteristics of the site in relation to the other grandfathered docks in the area. Heath persuasively argues the ALC failed to give deference to DHEC's interpretation and application of its own regulations and that DHEC properly considered an alternative alignment across extended property lines under regulations 30-12(A)(1)(e) and (p) because portions of several other landowners' docks already lie within Heath's own extended property lines.[6]

During his testimony, Stout was asked about the application of regulation 30-12(A)(1) to DHEC's consideration of Heath's permit application. Regulation 30-12(A)(1) sets forth project standards for docks and piers constructed over and on South Carolina's tidelands and coastal waters, and provides in pertinent part that:

---

[6] "[W]he[n] an agency charged with administering a statute or regulation has interpreted the statute or regulation, courts, including the ALC, will defer to the agency's interpretation absent compelling reasons. We defer to an agency interpretation unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'" *Kiawah Dev. Partners, II*, 411 S.C. at 34–35, 766 S.E.2d at 718 (quoting *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)); *but see S.C. Coastal Conservation League v. S.C. Dep't of Health & Envtl. Control*, 363 S.C. 67, 75, 610 S.E.2d 482, 486 (2005) (noting the agency's reviewing body, "not [agency] staff, is entitled to deference from the courts").

(e) All applications for docks and piers should accurately illustrate the alignment of property boundaries with adjacent owners and show the distance of the proposed dock from such extended property boundaries. For the purpose of this section, the extension of these boundaries will be an extension of the high ground property line. The Department may consider an alternative alignment if site specific characteristics warrant or in the case of dock master plans, when appropriate.

. . .

(p) No docks, pierheads or other associated structures will be permitted closer than 20 feet from extended property lines with the exception of joint use docks shared by two adjoining property owners. However, the Department may allow construction closer than 20 feet or over extended property lines where there is no material harm to the policies of the Act.

S.C. Code Reg. 30-12(A)(1)(e) and (p).

Stout acknowledged subsection (p) generally requires docks be constructed no closer than twenty feet from extended property lines but asserted the Regulation allows docks to be closer and to cross extended property lines if such would cause "no material harm to the policies of the Act." According to Stout, "the site-specific characteristics of this section of Main Creek warrant[ed] an alternative alignment" for Heath's dock because other existing docks in the area reached outside their own extended property lines and into Heath's dock corridor. Heath's requested spacing was consistent with the spacing of docks in the area, and several other docks in the area had two permitted boat storage structures.

Stout testified the distance between Heath's relocated floating dock and the adjoining property north of his was twenty-two feet. He characterized the area as "crowded" even though some docks were more than twenty feet apart due to construction on grandfathered docks outside their various dock corridors. While Stout recognized the addition of the boatlift would result in less open space between Schwiers's and Heath's docks, he noted the stairs for Schwiers's dock led south, away from Heath's dock, and would be the point of entry for her family to enter the water.

Unfortunately, Stout did not speak to Schwiers about her concerns and never met on site with her or the other property owners to discuss the activities they claimed the Heath boatlift addition might limit. Stout testified DHEC was required to contact citizens opposing a permit application only when clarification was needed as to the nature of the opposition. Here, no such clarification was necessary because Schwiers's "comments and concerns were very clear." Schwiers cogently detailed her concerns and opposition to the boatlift addition in her written correspondence to DHEC.

Stout testified he considered "the use and enjoyment of adjacent docks in [his] decision making." He explained, "What we review is our site visit photographs, aerial photographs that can be produced either through the county's website, Google Earth or our GIS data reviews. We look at the features of your [Schwiers's] dock and where they sit in reference to the dock that's being modified." At the time of the contested case hearing, Stout had been doing dock permit reviews in this area of Main Creek for eight years and noted other docks in the immediate area with "much less than 16.5 feet" between them. Some docks had less than ten feet between them; others were almost touching. Finally, Stout noted DHEC's policies "actually encourage boatlifts" to keep boats off the bottom of the creek floor.

DHEC determined the site-specific characteristics of this area of Main Creek warranted an alternative alignment for the modification to Heath's dock—thereby allowing him to be closer than twenty feet from the extended property line— because his existing dock was already outside of the extended property lines, as were a number of other grandfathered docks in the area. In its prehearing statement, DHEC explained it found the boatlift addition would cause no material harm to the policies of the Act because the proposed modifications and spacing were consistent with other docks along Heath's street and in the vicinity.

The ALC concluded the proposed boatlift location in relation to extended property line constituted material harm to the policies of the Act because it "affected the value and enjoyment" of Schwiers's property. Because we find the ALC erred in finding the impact to Schwiers's recreational use rose to the level of "material harm to the policies of the Act," we likewise reverse any finding that permitting the proposed location of the boatlift outside of Heath's extended property lines would

rise to the level of material harm to the policies of the Act under regulation 30-12(A)(1)(p).[7]

## Conclusion

For the foregoing reasons, the decision of the ALC denying Heath's application to amend his critical area permit is

**REVERSED**.

**LOCKEMY, C.J., and SHORT, J., concur.**

---

[7] Heath also argues the ALC erred in failing to consider the provision of regulation 30-11(A)(2) requiring DHEC to ensure consistent permit evaluations. *See* R. 30-1(A)(2)(b) (stating "[t]hese rules and regulations are intended to . . . insure consistent permit evaluations by the Department."). Because we reverse on other grounds, we decline to reach the merits of this issue. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding the appellate court need not address the appellant's remaining issues when disposition of prior issues is dispositive).