# The Supreme Court of South Carolina

South Carolina Coastal Conservation League, Appellant,

v.

South Carolina Department of Health and Environmental Control, KDP, II, LLC, and KRA Development, LP, Respondents.

Appellate Case No. 2019-000074

---

## ORDER

---

After careful consideration of the petition for rehearing, the Court is unable to discover that any material fact or principle of law has been either overlooked or disregarded, and hence, there is no basis for granting a rehearing. However, the attached opinion revises footnote eight and is substituted for the previous opinion, which is withdrawn.

s/ Donald W. Beatty                C.J.

s/ Kaye G. Hearn                  J.

s/ John Cannon Few              J.

s/ George C. James, Jr.           J.

I stand by my original writing, but I do not believe my differences with the majority warrant the granting of rehearing. I vote with the majority, therefore, to substitute the revised majority opinion and refile.

s/ John W. Kittredge             J.

Columbia, South Carolina

September 1, 2021

# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

South Carolina Coastal Conservation League, Appellant,

v.

South Carolina Department of Health and Environmental Control, KDP, II, LLC, and KRA Development, LP, Respondents.

Appellate Case No. 2019-000074

———————

Appeal from the Administrative Law Court
Ralph King Anderson, III, Administrative Law Judge

———————

Opinion No. 28031
Heard March 23, 2021 – Filed June 2, 2021
Re-Filed September 1, 2021

———————

**REVERSED**

———————

Amy Elizabeth Armstrong, of S.C. Environmental Law Project, of Pawleys Island, for Appellant South Carolina Coastal Conservation League.

George Trenholm Walker and Thomas P. Gressette, Jr., both of Walker Gressette Freeman & Linton, of Charleston, for Respondents KDP II, LLC and KRA Development, LP, and Bradley David Churdar, of Charleston, for Respondent South Carolina Department of Health and Environmental Control.

———————

**JUSTICE HEARN:** The preservation of one of only three remaining pristine sandy beaches accessible to the general public—Captain Sam's Spit on Kiawah Island—is before the Court for a third time.[1] Twice before, the administrative law court (ALC), over the initial objection of the South Carolina Department of Health and Environmental Control (DHEC), has granted permits for the construction of an extremely large erosion control device in the critical area.[2] Twice before, this Court has found the ALC erred. *See Kiawah Dev. Partners, II v. S.C. Dep't of Health & Envtl. Control,* 411 S.C. 16, 766 S.E.2d 707 (2014) (*KDP I*); *Kiawah Dev. Partners, II v. S.C. Dep't of Health & Envtl. Control*, 422 S.C. 632, 813 S.E.2d 691 (2018) (*KDP II*).

The current appeal stems from the ALC's third approval of another gargantuan structure—a 2,380-foot steel sheet pile wall—designed to combat the erosive forces carving into the sandy river shoreline, especially along its narrowest point called the "neck," in order to allow a developer to construct a road to facilitate development of fifty houses. DHEC, reversing its prior stance, issued four permits to construct the steel wall, which the ALC upheld. While the Coastal Conservation League (League) raises numerous issues on appeal, we hold the ALC erred in three respects: in accepting DHEC's narrow, formulaic interpretation of whether a permit that indisputably impacts a critical area warrants the more stringent review normally accorded to such structures; in relying on the protection of Beachwalker Park to justify the construction of the entire wall; and, in determining the public will benefit from the wall based on purely economic reasons. Accordingly, we reverse.

## FACTS/PROCEDURAL BACKGROUND

Captain Sam's Spit encompasses approximately 170 acres of land above the mean high water mark along the southwestern tip of Kiawah Island and is surrounded by water on three sides. Although the Spit is over a mile long and 1,600 feet at its widest point, the focal point of this appeal concerns the land along the narrowest point—the neck—which is the isthmus of land connecting it to the rest of Kiawah Island. The neck occurs at a deep bend in the Kiawah River where it changes direction before eventually emptying into the Atlantic Ocean via Captain Sam's Inlet. The neck has been migrating eastward due to the formidable erosive forces of the

---

[1] While there are other coastal areas with undeveloped beachfronts, according to DHEC, Captain Sam's Spit, Hunting Island State Park, and Huntington Beach State Park are the only three pristine beaches readily accessible to the general public.

[2] At oral argument before the Court, counsel for DHEC stated he did not believe "there has ever been anything like this before" permitted in South Carolina.

Kiawah River, although the depletion of the river bank has historically been outpaced by the accretion of sand on the oceanside. Nevertheless, the "access corridor"—the buildable land between the critical area and the ocean-side setback line—has narrowed significantly in the last decade to less than thirty feet.[3] The width of the neck is particularly relevant as KDP needs enough space to build a road in order to connect to its proposed development, which is planned for further down the Spit.[4] At the base of the neck located along the Kiawah River is Beachwalker Park, operated by the Charleston County Parks and Recreation Commission.

At the time KDP acquired the Spit in 1988, it was seaward of the baseline set by the Office of Coastal Resource Management and was not authorized for development. In 1999, DHEC relocated the baseline along the coast and extended it to include portions of the Spit, making KDP's property landward of the setback line that paralleled the ocean side available for development. In 2005, KDP entered into a development agreement with the Town of Kiawah Island whereby KDP relinquished its right to build a hotel on the island in favor of the right to develop up to fifty residential lots on the Spit. The fifty lots would occupy roughly twenty acres on the Spit, and development would occur in two phases.

In February of 2008, KDP sought a permit to build a 2,783-foot vertical bulkhead and revetment within the critical area along the Kiawah River shoreline. DHEC denied most of the permit, with the exception of a 270-foot segment to protect Beachwalker Park. Both the League and KDP appealed, and the ALC ultimately granted approval for the entire structure. Both parties appealed, and after three oral arguments and two prior opinions on rehearing, we found the ALC erred in: relying on the benefits to the private developer and the Town of Kiawah instead of the public as a whole; declining to consider the extent of the effects to the upland property; and determining the structure would have no adverse impact on public access to the area. *KDP I*, 411 S.C. at 44, 766 S.E.2d at 723. On remand, the ALC again approved the bulkhead but without the revetment except for the first 270 feet, which would utilize both structures. On appeal, we affirmed the approval of the 270-foot portion but reversed the remaining segment which would only contain the bulkhead because

---

[3] That distance was about 60 feet in 2010, 39 feet in 2014, and 29.25 feet in 2016.

[4] The record demonstrates the proposed road will be 20 feet wide, but an additional 8.5 feet will be needed to install the guardrail, the steel wall, and sufficient space during construction to avoid the critical area. That leaves less than a foot at the neck's narrowest place based on calculations from 2016.

there was no evidence in the record to support bifurcating the structures. *KDP II*, 422 S.C. at 637, 813 S.E.2d at 694.

Following our remand in *KDP I*, KDP filed a permit application in 2015 taking a new approach to protect its upland private property—the construction of an erosion control device outside of the critical area in order to encompass DHEC's less stringent review policy for non-critical area permits.[5] This structure, the steel sheet pile wall at issue before us, consists of drilling into the ground approximately sixty, forty-foot long steel sheet piles double-coated with coal tar epoxy so that only six and a half feet of the wall is above the mean sea level. Accordingly, the wall is considered an in-ground structure. The sections would be connected with a galvanized channel wall horizontally anchored approximately every six feet. Construction of the steel wall would occur in two phases, beginning with a portion from the neck and down the riverside to the southwest portion of the Spit. The second phase would extend from Beachwalker Park to the neck.

Unlike the revetment and bulkhead, the wall is permitted for the highland side of the critical area, meaning KDP would only build outside the critical area. However, the proposed building area has consistently narrowed, and the expert testimony established it is not a matter of *if* but *when* the critical area will encompass the wall as the critical line continues its march towards the ocean setback line. Despite this uncontroverted fact, DHEC declined to utilize the more stringent analysis applicable to a critical area permit, instead determining the permits complied with the Coastal Zone Management Plan (CMP). After DHEC granted the permits and certification, the League requested that the Board conduct a final review, but it declined to do so.

---

[5] KDP sought three permits and approval through a Coastal Zone Consistency Certification. The certification is not as detailed a review as a critical area component, but is instead part of DHEC's review that the project complies with the Coastal Zone Management Plan, which is mandated by the South Carolina Coastal Zone Management Act. *See* The Coastal Zone Management Act, Title 48, Chapter 39 of the South Carolina Code (2008 & Supp. 2020); The Coastal Zone Management Program, South Carolina Department of Health and Environmental Control, https://scdhec.gov/environment/your-water-coast/ocean-coastal-management/coastal-zone-management/south-carolina. The permits and certification enable KDP to construct a roadway, stormwater management system, utility lines, gravity sewer, manholes, a pump station, a force main, and water lines.

The League then sought a contested case hearing before the ALC, which occurred over the course of seven days in August of 2017. Numerous expert witnesses testified, as well as several lay persons who frequented the Spit. Alan Wood, one of the League's experts, testified he conducted surveys in 2017 which demonstrated the critical line had shifted markedly towards the setback line since KDP filed its permit application two years earlier. As a result, Wood identified six locations where construction of the steel wall would encroach into the critical area. Conversely, KDP's expert, John Byrnes, testified only two of the locations Wood specified were actually in the critical area.

The hearing also contained the testimony of DHEC staff who had denied the majority of the 2008 permit, specifically, Bill Eiser, the project manager at that time, and Curtis Joyner, the Manager of the Coastal Zone Consistency Section. Joyner reviewed the certification of the permits in question. On cross, Joyner admitted the steel wall would prevent shoreline movement and become exposed, both of which would be considered a cumulative impact that changed the character of the area. Joyner also testified that he received letters from the South Carolina Department of Natural Resources and the United States Department of Interior as required during the review process and that both agencies opined the area was too unstable for development. Significantly, the access corridor where the proposed road will be constructed has narrowed by more than half—from sixty to less than thirty feet— since Joyner received those recommendations.

The ALC ultimately upheld DHEC's approval of the permits and certification, determining that because the permits were for development outside of the critical area, it did not have to consider Section 48-39-30(D) of the South Carolina Code (2008) (mandating that "critical areas shall be used" to ensure "the maximum benefit to the people"). The ALC found the proposed project would not violate III.C.3.I(7) of the CMP which required a consideration of the "long range, cumulative effects" in the context of potential development of the property and the "general character of the area." The court acknowledged that authorizing the wall would facilitate development, so the inquiry focused on the character of the area and the resulting long-range, cumulative effects. The ALC accepted DHEC's interpretation that the general character of the area was residential development after comparing the Spit to other portions of Kiawah Island and neighboring Seabrook Island. Concerning the long-range effects of permitting the wall, the ALC stated:

> It is reasonably certain that the Kiawah River's erosive forces will eventually cause the [wall] to be exposed to some degree, resulting in a loss of riverbank where the [wall] is exposed. This is a long-range

effect. However, when the loss of riverbank will occur and the percentage of the [wall] that will eventually be exposed is speculative.

The court found the public primarily used the oceanside of the Spit while the riverside was used only occasionally. Despite an existing permit to build a 270-foot bulkhead and revetment adjacent to Beachwalker Park, the court again relied on protecting the park as justification for erecting the entire structure. The court also noted public access to the riverbank would remain because it is speculative as to how much of the wall will be exposed in the future.

Additionally, the court determined the project would not be inconsistent with state policy set forth in section 48-39-30 because the economic, social, and environmental concerns must be balanced when determining whether to grant these permits. In doing so, the court relied on increased tax revenues, creation of jobs, and "[other] contribut[ions] to the economic and social improvement of citizens of this state." Further, the ALC found the Spit will be improved with "due consideration for the environment," and that "[n]o portion of the proposed project falls within the critical area."

Finally, the court determined DHEC's decision to grant the permit was not legally inconsistent with its prior decision denying the full bulkhead and revetment in 2008 or with our prior opinions in *KPD I & II*. In doing so, the court stated that an agency is permitted to change its mind, and while the permit outcome was different, the decision was not made through any arbitrary or capricious exercise of authority. Thereafter, the League filed an appeal, and we certified the case pursuant to Rule 204(b), SCACR.

## ISSUES

I. Did the ALC err in upholding DHEC's determination that the more rigorous permitting process under section 48-39-30 did not apply because the steel wall would be constructed outside the critical area?

II. Did the ALC err in its public benefit analysis by considering the protection of Beachwalker Park and in relying on projected tax revenue that the project would produce?

## STANDARD OF REVIEW

This Court will affirm a decision by the administrative law court unless the findings or conclusions are:

(a) in violation of constitutional or statutory provisions;
(b) in excess of the statutory authority of the agency;
(c) made upon unlawful procedure;
(d) affected by other error of law;
(e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
(f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

S.C. Code Ann. § 1-23-610(B)(a)-(f) (Supp. 2019). The ALC is the finder of fact in contested case hearings related to DHEC certifications and permits. *See Hill v. S.C. Dep't of Health & Envtl. Control*, 389 S.C. 1, 9, 698 S.E.2d 612, 616 (2010) ("The proceeding before the ALJ was a de novo hearing, which included the presentation of evidence and testimony."). In determining whether substantial evidence supports the ALC's decision, the Court must find "looking at the entire record on appeal, evidence from which reasonable minds could reach the same conclusion that the ALJ reached." *Id.* at 9–10, 698 S.E.2d at 617.

## DISCUSSION

At the outset, we reiterate that "the basic premise undergirding our analysis must be the public trust doctrine which provides that those lands below the high water line are owned by the State and held in trust for the benefit of the public." *KDP I*, 411 S.C. at 29, 766 S.E.2d at 715. Further, "the public's interest must be the lodestar" of our analysis. This is because the General Assembly has set forth its policy of protecting "the quality of the coastal environment and [promoting] the economic and social improvement of the coastal zone and of all the people of the State." S.C. Code Ann. § 48-39-30(A) (2008). While section 48-39-30 demonstrates that development is not prohibited in sensitive areas, artificially modifying the tidelands remains the "exception." *KDP I*, 411 S.C. at 29, 766 S.E.2d at 715. Accordingly, it is through this lens that we review the ALC's decision.

### I.     Critical Area and Section 48-39-30

The League asserts the ALC erred as a matter of law by failing to apply section 48-39-30(D), which pertains to critical areas, because the river shoreline is within a critical area notwithstanding the fact that the permit for the wall requires the structure to be built on the upland side. While the League rejects the conclusion that the project actually can be accomplished without intruding into the critical area, it also argues that even if that is initially the case, all the experts agreed the erosion would

continue until the river exposed the wall, thus eliminating the sandy shoreline and shifting the critical line further inland beyond the structure. Therefore, the League asserts the ALC should have explicitly addressed the policies specific to critical area permits because it is certain the steel wall will ultimately encroach upon the critical area.

Conversely, KDP and DHEC contend the ALC did not err because the steel wall is required to be constructed outside the critical area. As a result, KDP and DHEC assert the more intensive scrutiny that governs critical area permits—such as those at issue in *KDP I & II*—does not apply here. In other words, the permit was reviewed under DHEC's indirect authority to certify the structure's compliance with the CMP rather than under DHEC's direct authority to ensure the construction adheres to the policies pertaining to critical area permits.

The critical area is defined as "any of the following: (1) coastal waters; (2) tidelands; (3) beaches; (4) beach/dune system which is the area from the mean high-water mark to the setback line as determined in Section 48-39-280." S.C. Code Ann. § 48-39-10(J)(1)-(4) (2008). The General Assembly has declared the state policy pertaining to critical areas in section 48-39-30(D), which provides,

> Critical areas shall be used to provide the combination of uses which will insure [sic] the maximum benefit to the people, but not necessarily a combination of uses which will generate measurable maximum dollar benefits. As such, the use of a critical area for one or a combination of like uses to the exclusion of some or all other uses shall be consistent with the purposes of this chapter.

At first blush, KDP's and DHEC's position seems plausible. Because the certification requires construction of the steel wall to occur upland of the critical area, it was ostensibly not necessary for KDP to seek a special permit or for its application to undergo rigorous analysis. However, this interpretation is misleading, and is actually similar to the steel wall itself—initially it may be obscured, but once the sand shifts, it will become visible and ultimately replace the sandy beach. All the expert testimony confirmed the erosion would continue until the wall became exposed—otherwise there would be no need for an erosion control device. As Robert Young, an expert for the League, testified,

> Eventually and probably very quickly, the wall is going to become a part of the Kiawah River shoreline and, in fact, if the wall were not going to become a part of the Kiawah River shoreline, you would

probably never build it because if the wall was just going to remain buried in the interior of the island forever, there would be not much point in having the wall.

Even DHEC acknowledged in its brief the "admittedly realistic concern" that the critical area will overtake the steel wall.[6] Nevertheless, the agency felt constrained by a formulaic approach even when expert testimony demonstrated a virtual certainty that the critical area would be impacted.

We acknowledge the existence of conflicting opinions as to when and to what extent this proposed structure will impact the critical area; however, all the expert witnesses agreed that the sandy shoreline—indisputably a critical area—will ultimately be subsumed by the steel structure and at least part of it will be eliminated. Therefore, we find there is no evidence to support a finding that the steel wall will not have an *impact* on the critical area. Certainly there may be cases where the expert testimony diverges or where DHEC justifiably believes an upland structure will remain outside the critical area and not impact it, but that is simply not the case here. Therefore, the ALC erred in declining to apply section 48-39-30(D).[7]

## II. Public Benefit

### A. Reliance on Beachwalker Park

The League contends the ALC erred in yet again emphasizing the protection of Beachwalker Park as a sufficient public benefit to justify the entire structure. Specifically, the League asserts the ALC committed an error of law in concluding without evidence that the public trust lands will be enhanced by protecting the park. Conversely, KDP asserts the ALC properly balanced the competing interests, and

---

[6] At oral argument, counsel for DHEC candidly agreed with Justice Few's observation that "this structure serves no purpose whatsoever until the critical line hits it . . . . The wall serves no purpose whatsoever until the river pushes up against it and it stops the river from moving into the road or into the development."

[7] Because the inquiry as to whether to apply the more rigorous critical area permitting analysis for a structure designed to be constructed outside the critical area depends on the facts of the case, we decline to adopt a bright line rule as to when DHEC must analyze section 48-39-30(D) for a non-critical area permit. However, we trust that in future cases DHEC will exercise its discretion appropriately in a manner consistent with upholding the basic premise that altering the tidelands remains the "exception to the rule." *KDP I*, 411 S.C. at 29, 766 S.E.2d at 715.

substantial evidence supports its decision that the steel wall would outweigh the benefit to the public to a greater degree than any harm of the loss of the shoreline. We agree with the League that the ALC committed an error of law because it focused on the protection of the park to bootstrap its public benefit analysis of the rest of the lengthy steel wall.

Section 48-39-150(A)(5) requires DHEC to consider "[t]he extent to which the development could affect existing public access to tidal and submerged lands, navigable waters and beaches or other recreational coastal resources." S.C. Code Ann. § 48-39-150(A)(5) (2008). Further, III.C3.XII.D. of the CMP mandates that DHEC review permits that affect public open space under the following considerations:

1) Project proposals which would restrict or limit the continued use of a recreational open area or disrupt the character of such a natural area (aesthetically or environmentally) will not be certified where other alternatives exist.
2) Efforts to increase the amounts and distribution of public open space and recreational areas in the coastal zone are supported and encouraged by the Coastal Council.

The ALC acknowledged "the riverbank is both a recreational and a natural open space area." However, the court determined the League did not raise any alternatives, and the choice of doing nothing failed to protect the public's interest. Therefore, the court weighed the loss of the riverbank against the protection of the park. Ultimately, the court concluded the project would "greatly assist in preserving" an important benefit: the parking lot at Beachwalker Park. The public would further benefit from a conservation easement, and the public's use and enjoyment would not be disrupted to a degree sufficient to deny the permits. While the court recognized that KDP would also benefit, it stated, curiously and with little explication, that the outcome was a "compromise."

We find the ALC's analysis is fatally flawed because the court once again focused on the public benefit of protecting the park as a justification for the entire 2,380-foot steel wall. While the ALC relied on the 270-foot portion that would protect Beachwalker Park for its public benefit analysis—which represents approximately 10% of the entire wall—it did not find *any* public benefit to the remaining 90%. In essence, KDP seeks to hold the protection of the park hostage until it is permitted to construct the entire wall. This is so even though the Charleston County Parks and Recreation Commission originally applied for a permit to build a

structure to protect the park *fifteen years ago* and only agreed to withdraw that request at the behest of KDP. The park also remains unprotected despite this Court's approval of a permit to do just that. *See KDP II*, 422 S.C. at 639–40, 813 S.E.2d at 695. Therefore, the ALC relies on a largely illusory benefit to support its public interest analysis.[8]

Further, because the shoreline will erode until the riverbank reaches the steel wall, the public is essentially left in the same situation as we described in *KDP I*— the complete loss of area held in trust for the benefit of the people. Despite this inescapable conclusion, the ALC disregarded that paramount concern for a third time. Accordingly, the ALC erred in relying on the protection of the park as a reason to uphold the entire structure.

### B. Balancing of Economic, Social, and Environmental Interests

The League contends the ALC erred in solely relying on the economic benefit of the overall project. Specifically, the League argues the ALC improperly focused on the expected tax revenue and increased jobs as part of its public benefit analysis. Conversely, KDP asserts the ALC properly balanced the economic, social, and environmental interests. We agree with the League.

Section 48-39-150 requires DHEC to base its decision to approve or deny a permit on the "merits of each application, the policies specified in sections 48-39-20

---

[8] Indeed, the ALC acknowledged KDP would not protect the park unless it could construct the entire structure, thus effectively conceding the specious nature of justifying construction of the entire wall to benefit Beachwalker Park. At oral argument, counsel for KDP asserted the 270-foot portion could not be constructed because it would ultimately fail as the river eroded around and behind the end of the structure. While we acknowledged in *KDP II* that a bulkhead without a revetment would actually exacerbate erosion because the toe would become exposed, that conclusion was based on "all of the evidence in the record . . . ." 422 S.C. at 637, 813 S.E.2d at 694. Here, the record in this case does not support the assertion that an erosion control device protecting only the park would be futile. Further, even though KDP disputes the efficacy of a device that only protects Beachwalker Park, over the course of fifteen years, the Charleston County Parks Commission, DHEC, and this Court have either sought or approved a permit for 270 feet. Accordingly, we reject the assertion that a 2,380-foot structure must be built to protect the limited area adjoining the park.

and 48-39-30 and be guided by [ten] general considerations." S.C. Code Ann. § 48-39-150(A).  Together, these three provisions require a balancing of competing interests when development is contemplated along our precious coastal resources. While economic interests are relevant, relying on tax revenue or increased employment opportunities is not sufficient justification for eliminating the public's use of protected tidelands.  We have previously rejected the certification of a project that sought to dredge a canal through wetlands in order to facilitate waterfront development near the Waccamaw River.  *S.C. Wildlife Fed'n v. S.C. Coastal Council*, 296 S.C. 187, 188, 371 S.E.2d 521, 522 (1988).  The Court noted,

> To support certification, Litchfield submitted an expert report that projects speculative economic benefit to the public in the form of new jobs and tax revenue if the project is completed.  Respondents rely on this evidence to show an overriding public interest.  This evidence of purely economic benefit, however, does not support the stated purpose of the Coastal Management Program to protect, restore, or enhance the resources of the State's coastal zone for present and succeeding generations.  This public interest must counterbalance the goal of economic improvement.  *See* S.C. Code Ann. § 48-39-30(B)(1) and (2) (1987).  *We hold evidence of purely economic benefit is insufficient as a matter of law to establish an overriding public interest.*

*Id.* at 190, 371 S.E.2d at 522–23 (emphasis added).  Further, we stated "the record is devoid of any evidence of an overriding public interest in the permanent alteration of these wetlands."  *Id.* at 190, 371 S.E.2d at 522.

While the ALC acknowledged this decision, the court ultimately determined that "the proposed project will increase tax revenues in the area, create jobs, and otherwise contribute to the economic and social improvement of citizens of this state."  The court noted the development is planned in an otherwise environmentally friendly manner and that no portion of the project is within the critical area.  The ALC determined the steel wall will stabilize the neck, thus enabling a road to be constructed through the narrow passage.[9]

Because we find the ALC erred in using protection of the park as a reason for approving the entire wall, the only remaining justification is its conclusion that the

---

[9] The ALC ostensibly discounted the League's expert, Robert Young, who testified building a road along the narrow neck is "kind of like trying to shove a hippo through a mouse hole."

economic benefits outweigh the social and environmental interests in keeping the area undeveloped.  In other words, once the fallacy of protecting the park as a reason for constructing the remaining 90% of the wall is brought to light, all that remains to justify the entire structure are the purely economic benefits of tax revenue and temporary job creation, which cannot, as a matter of law, supplant the permanent elimination of the critical area.  Thus, the ALC erred in upholding the permits and certification.  *Id.* at 190, 371 S.E.2d at 523 ("[E]vidence of purely economic benefit is insufficient as a matter of law to establish an overriding public interest.").

## CONCLUSION

We conclude the ALC erred in declining to apply section 48-39-30(D)'s more stringent review based on the record before us.  We also find the ALC erred as a matter of law in relying on protecting Beachwalker Park as a reason to uphold the entire structure and in citing purely economic interests in its public benefit analysis.[10]

**REVERSED.**

**BEATTY, C.J., FEW and JAMES, JJ., concur.  KITTREDGE, J.,  concurring in a separate opinion.**

---

[10] The League also contended the ALC erred in determining: the project physically could be constructed as permitted; the character of the area was residential; collateral estoppel applied; and substantial evidence did not support the ALC's conclusion concerning the minor impact to marine wildlife. We decline to address these issues on appeal. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (declining to address other arguments after reaching one that is dispositive).

**JUSTICE KITTREDGE:**  The Court reverses the Administrative Law Court in multiple respects.  I join only Section II of the majority opinion and concur in result.